Bank *v.* Looney.

## *\* BANK *v.* LOONEY.

*(Jackson.* September 22, 1897.)

1. BILLS AND NOTES. *Execution of, induced by misrepresentation, no defense.*

   That the maker of a note was induced to execute it by false representations as to the value and income and the incumbrances on property for an interest in which it was given, does not avoid the note where the misrepresentations were not made by the vendor, or by his authority or procurement, but by parties associated with the maker in a syndicate for the purchase of the property. (*Post, pp. 284–289.*)

2. SAME. *Innocent purchaser.*

   A bank that discounts a note in good faith, before its maturity, without notice of any defenses against it, paying value therefor, by the surrender of secured notes and claims on third persons and the payment of a small balance in cash, is such purchaser for value as is protected against the defense of failure of consideration and fraud in procurement of note. (*Post, pp. 289, 290.*)

   Cases cited and approved: Nichol *v.* Bate, 10 Yer., 428; Cherry *v.* Frost, 7 Lea, 1; Jordan *v.* Jordan, 10 Lea, 134; Lookout Bank *v.* Aull, 93 Tenn., 646.

3. SAME. *Describing payee as trustee is negotiable.*

   That the payee of a note is therein described as "trustee," does not destroy its negotiability and let in defenses against a *bona fide* holder for value by indorsement before maturity, without notice of defenses. (*Post, pp. 290–294.*)

   Cases cited: Alexander *v.* Alderson, 7 Bax., 403; Covington *v.* Anderson, 16 Lea, 310; Caulkins *v.* Gaslight Co., 85 Tenn., 684; 15 Wall., 175; 51 Md., 138; 37 S. W. Rep., 1102; 17 Minn., 493; 6 N. Y., 124; 60 Ala., 448.

4. SAME. *Payee liable, though described as "trustee."*

   The addition of the descriptive term "trustee" to the name of the payee in a note and to his name as indorser thereon, does not relieve him from liability as indorser. (*Post, pp. 295, 296.*)

+The authorities on the question of the negotiability of a note payable to a trustee are collected in a note to *Fox* v. *Citizens' Bank & Trust Co.*, 35 L. R. A., 678.

Bank *v.* Looney.

Cases cited and approved: Erwin *v.* Carroll, 1 Yer., 144; McWhirter *v.* Jackson, 10 Hum., 209; Carter *v.* Wolfe, 1 Heis., 694; 9 Johns., 334; 1 Blackford, 189; 12 Col., 168; 5 Vt., 500; 2 Me., 305.

5. SAME. *Indorser's liability.*

An indorser of a note, describing himself as "trustee," is not relieved of liability by the fact that the indorsee was informed, when the note was delivered, that the indorser had no interest in the transaction. (*Post, pp. 296, 297.*)

Case cited and approved: 168 Pa. St., 468.

6. SAME. *Facts that do not constitute settlement of.*

A note is not extinguished or satisfied as to the maker and his accommodation indorser by an agreement between the holder and a subsequent indorser, whereby the latter is permitted to substitute other securities in lieu of his indorsement, but stipulating that the liability of the other parties should not be thereby affected. (*Post, pp. 294, 295.*)

FROM SHELBY.

Appeal from Chancery Court of Shelby County. JOHN L. T. SNEED, Ch.

W. H. RUFFIN and W. B. GLISSON for Bank.

THOS. M. SCRUGGS, WM. M. RANDOLPH & SONS, and A. S. BUCHANNAN for Looney.

BEARD, J. The complainant, being the owner of a $12,500 note, one of two notes of like amount executed by R. F. Looney to the order of J. P. Sykes, trustee, and by him and the Sheffield City Company indorsed to complainant, filed this bill, seeking a decree for the amount of this note and

interest, and also for a foreclosure of a trust deed made to secure it. The bill alleges that this trust deed was executed by Looney and wife on certain real property belonging to the wife, in or near Memphis, and that the property was already, in part or in whole, covered by two other trust deeds; that J. P. Sykes, the indorser of this note, was also trustee in the trust deed, and that though complainant's note was long past due, and full power of sale on such contingency was granted to the trustee, yet he declined to execute this power. Sykes, as indorser and as such trustee, Looney and wife, the trustees and beneficiaries in the other two trust deeds, and the United States National Bank, as the alleged holder of the other of these notes, were made parties to this bill. The claim of complainant not being before us, we need not pursue it further.

The United States National Bank filed an answer to the original bill, and made its answer a cross bill, in which it asked affirmative relief. In this answer and cross bill it was averred that the United States National Bank was the holder of the other of these two notes of $12,500, having acquired title thereto, *bona fide*, for a valuable consideration, before maturity and in due course of trade; that this note was also made payable to J. P. Sykes, trustee, that it was by him and the Sheffield City Company indorsed, and that at maturity it was duly protested for nonpayment, of all of which the indorser had legal notice. The cross bill prayed that the trust

deed described in the original bill be foreclosed, and the proceeds of the foreclosure sale be applied to the payment of this note. To this cross bill Looney and wife and J. P. Sykes filed answers. In their answer Looney and wife denied that the United States National Bank acquired this note in due course of trade, for value, and without notice of the makers' equitable defenses against it, and they aver that the note and trust deed to secure it were procured by fraud, and that no valuable consideration passed to them for the same. The fraud complained of, and as set out in the answer, is as follows: In July, 1892, and for some time before, there existed, at Sheffield, Ala., a corporation called the "Sheffield Land, Iron & Coal Company," which was the owner of various properties, real and personal. The operations of this corporation seem to have become embarrassed by heavy debts, the burden of which was largely carried by some of its stockholders. Certain of these parties about that time conceived the idea of relieving themselves of this burden by organizing a syndicate to purchase the assets of the corporation, and to this end they solicited a subscription from R. F. Looney, and perhaps others, and, in order that the parties so solicited might understand the character of the assets, there was prepared a statement or schedule of the same, together with extensions showing their value. In this paper, these assets were set down as worth $1,012,676.81, and it is alleged that representations were made to Loo-

ney in this paper, and otherwise by these gentlemen, that these values were in no sense speculative, but that they were 'real.

In the answer it is also stated that it was in the same way represented that $300,000 would pay all the debts of the corporation and that all the assets so scheduled would be turned over to the syndicate, unincumbered, save for the burden of a bonded debt of $60,000 resting on the hotel in Sheffield, and scheduled as part of these assets, which was to be taken care of by the syndicate, but that it was at the same time stated to him that the rents derived from the hotel property would be sufficient to pay the interests on these bonds. Relying on their statements, the answer avers that R. F. Looney subscribed for a share of $50,000 of and in the syndicate which was organized to purchase these assets at the sum of $300,000. The answer alleges that he was imposed upon greatly as to the value of these properties; that instead of being worth over a million of dollars, they were worth greatly less, and instead of being unincumbered, save in the single particular referred to, they were in numerous instances, and to their full value, hypothecated to the creditors of this corporation. The answer also alleges that the debts much exceeded $300,000. It is unnecessary to enter further into the details of the misrepresentations of which he alleges he was made the victim, it being sufficient to say that they were numerous and very great.

It is further stated in the answer that by his subscription of $50,000 to the capital of the syndicate, Looney was to be interested in the assets purchased in the proportion that this sum bore to the full amount of $300,000, and that to pay this subscription he executed his notes for $50,000, including the two notes of $12,500 each, secured by the trust deed in question. Looney and wife also filed a cross bill, in which they seek to have the notes delivered up for cancellation and to have the trust deed removed as a cloud on Mrs. Looney's title. Sykes also answers the cross bill and denies his liability as indorser, and avers that the United States National Bank took the note with full knowledge that his purpose in indorsing the note was simply to pass title, and in no respect to bind himself personally on it. The United States National Bank answered the cross bill of Looney and wife, denying its averment, so far as they impeached its title to the note sued on, and it reiterated that it was the *bona fide* holder of this paper. Subsequently amended answers were filed by Looney and Sykes, in which they alleged that since the filing of their original answer they had ascertained that this note had been paid to the holder, the United States National Bank, and that it had no right to prosecute further its suit upon it; that the debt of the bank was originally a debt due from the Sheffield Land & Iron Company, and that this debt was assumed by the Sheffield City Company when it was organized; that

this note, together with the other notes of Looney, heretofore described, were obtained by the false representations of the promoters of the Sheffield City Company, and that the note sued on by the United States National Bank was transferred to it in settlement of the debt of the Sheffield Land & Iron Company, which it had assumed; and that, subsequently, that bank had made an arrangement with the Sheffield City Company, as a result of which the note was fully discharged.

Upon the hearing, after much proof was taken, the Chancellor dismissed the cross bill of the United States National Bank, and, upon the cross bill of Looney, ordered the note to be canceled, as well as the deed of trust securing it. From this portion of the decree the bank has prosecuted its appeal to this Court.

The first question that will be considered is: Do the facts disclosed in the record afford a defense against the note in the hands of the bank, even if it be conceded it does not occupy the position of a *bona fide* holder for value? That Col. Looney was induced to go into a speculating scheme, which will prove disastrous to him if the note in suit is enforced against him, is true. And it may be conceded that the evidence in the case shows that the inducement which operated upon him and led him into this venture was a great overvaluation of the property and of its income, and a serious under-

Bank *v.* Looney.

valuation of the incumbrances on this property, made by parties in whom he reposed confidence.

And it may be granted, further, that the record shows that he was informed that his subscription of $50,000 would complete the sum of $300,000 to be raised by the syndicate, and that this amount would be sufficient to discharge the liabilities of the Sheffield Land, Iron & Coal Company, and that in neither respect was the statement true. But, granting all these as facts clearly made out, yet they are not, of themselves, sufficient to relieve him from liability on this note. To work this result, these misrepresentations must have been made by the vendor of this property or by some one authorized to act for it. On this point Col. Looney says that J. C. Neely and Napoleon Hill, of Memphis, E. W. Cole, Lewis Baxter, and others, of Nashville, were stockholders in that company and creditors of it, the three first named in very large amounts; that they induced Charlie Sykes, who was then its president and also a creditor of the company, to form a syndicate for the purpose of purchasing a part of the assets of the company, the object and purpose of the originators of the syndicate being to apply the purchase money they realized to the syndicate to the payment of the debts of the Sheffield Land, Iron & Coal Company, all of which were a. charge upon the entire property of that company, and leave a portion of its property "free of any incumbrance whatever."

He further says that these parties solicited sub-

scriptions from persons who were not creditors of the company, but that he knew of no one save himself, not a creditor, who took any interest in the syndicate. He also states in his deposition that he received two letters, one from Charles Sykes, whom he denominates "the promoter and organizer of the syndicate," and the other from J. C. Neely, a member of the syndicate, together with a schedule of assets that the syndicate proposed to buy, and that, relying on the truthfulness of the statements contained in these letters and in the schedule, he was induced to identify himself with the scheme. These letters were exhibited to the Court by him. The letter of Sykes did not profess to come from him as the president, or in any other respect as the representative of the selling company, but distinctly as the agent of the syndicate. He says, in reference to the Sheffield syndicate: "I beg to make the following statement: I was employed by some gentlemen, who were interested in the town, to go there and make an examination of the property offered, and, in addition, to make a conservative estimate of what could be realized from it. I had no idea of being interested in the company when I went down there. After looking the matter over thoroughly, I have agreed to put my money in it. I feel that, with careful management, I will get three dollars out for every dollar I put in. You, in my opinion, need not hesitate to say to your friends that this is an exceptional opportunity to make big money."

Bank *v.* Looney.

In his letter, Mr. Neely says: "You ask me to say what I know about the Sheffield syndicate, and will say, in reply, that I have known the town of Sheffield since it was first surveyed into lots. I have seen a schedule of property offered the syndicate . for $300,000, and have seen the property and know of its value. I think the property worth three times the amount valued above. I have subscribed myself, and would subscribe largely had I the ready money in hand." The schedule of property referred to in these letters, and the one furnished by Sykes to Col. Looney, shows the face or par value of the assets, which the syndicate proposed to buy for the sum of $300,000, to be $2,450,023.51, and the estimated·value to be $1,012,676.81. Not only this, but Mr. Charles Sykes, the promoter of this scheme, in his deposition taken in the interest of and read in behalf of Col. Looney, says: "I was employed by a syndicate to purchase the assets of the said Sheffield Land, Iron & Coal Company, and the said syndicate purchased the assets and property from the Sheffield Land, Iron & Coal Company for the sum of $300,000, and paid the sum in cash, or the valid subsisting indebtedness of that company."

It thus will be seen, whatever misrepresentations were the moving inducement to Col. Looney to enter into this unfortunate speculation, came not from the company selling these assets, but from his associates in the syndicate purchasing them. After a diligent

examination of the record, we have not been able to
discover a single misleading act or word of the
vendor corporation, or any one authorized to repre-
sent it, which induced this sale.    It seems to have
been the passive recipient of the consideration for
its assets, and whatever of wrong there may have
been in the transaction, was practiced upon Col.
Looney by parties interested with him in the specu-
lation.    This being so, we know of no rule of law
which would place upon the innocent vendor the re-
sponsibility of a fraud or misrepresentation practiced
by one or more of a number of vendees upon others
associated with them in a purchase.    And even as to
these parties, Col. Looney, in his deposition, repeat-
edly acquits them of all intention to wrong or de-
fraud him, but says that he is satisfied they thought
they would bring him out all right.    In addition,
however, the record shows that the trade with the
Sheffield Land, Iron & Coal Company was consum-
mated, and that the assets purchased were conveyed
by that company to one Cheany, and that he at
once conveyed them to a new corporation organized
as was contemplated by the parties composing the
syndicate, and known as the Sheffield City Company,
and that company accepted them at the valuation of
$1,000,000, and upon the basis of this valuation
issued $150,000 of its capital stock to Col. Looney,
as representing his interest in the institution.    It is
true this stock was not actually turned over to him,
but was held as collateral to his notes, yet it was

receipted for by him, and was thus recognized by him as the fruit of his investment.

But, independent of the question just considered, this defense cannot be maintained against the United States National Bank. The facts with regard to the ownership of the note sued on by that bank, are' as follows: "In October, 1892, this bank was the owner and holder of a note of the Sheffield Land, Iron & Coal Company for the sum of $11,391.82, besides interest, and, at the same time, it held a claim, in the shape of an overdraft, against the Bank of Commerce, of Sheffield, Ala., for $3,790.91. In this latter bank the Sheffield Land, Iron & Coal Company held a controlling interest. Mr. Sykes, representing a new corporation called the Sheffield City Company, to which the Looney notes had been assigned, proposed to the officers of the United States National Bank that, if they would discount the note of $12,-500 here sued on, that the proceeds of the discount might be applied to the extinguishment *pro tanto* of the two debts just mentioned, and that the excess of indebtedness over the discount would be paid to it in cash. This proposition was accepted by the United States National Bank, and the arrangement suggested was carried out in every respect. The bank thus received this note and the cash necessary to complete the transaction, and at the same time surrendered to the Sheffield City Company, as an extinguished liability, the note of the Sheffield Land, Iron & Coal Company, and certain collateral attached

15 P—19

to it, including its claim against the Bank of Commerce.

The note of Col. Looney was indorsed by its payee and by the Sheffield City Company, before its maturity, to this bank, and was taken by it without any notice of the circumstances under which it had been obtained. Pretermitting for the moment the effect on its negotiability that this note was made payable to "Joseph Sykes, trustee," and so indorsed by him, there is no question but that the facts just detailed make this bank a *bona fide* holder for value.

The extinguishment of the note of the Sheffield Land, Iron & Coal Company, and the surrender of the collaterals to secure it, and the discharge of the Bank of Commerce from liability on its overdraft, constituted the United States National Bank a purchaser for value in due course of trade of this note. This proposition is clearly established in this State. *Nichol* v. *Bate,* 10 Yer., 428; *Cherry* v. *Frost*, 7 Lea, 1; *Jordan* v. *Jordan*, 10 Lea, 134; and *Lookout Bank* v. *Aull*, 93 Tenn., 646. But it is said the fact that this note was payable to "Joseph Sykes, trustee," and was so indorsed by himself, of itself lets in against the bank all equities that attached to it in the hands of the original parties, and the cases of *Alexander* v. *Alderson*, 7 Bax., 403; *Covington* v. *Anderson*, 16 Lea, 310; and *Caulkins* v. *Gaslight Co.*, 85 Tenn., 684, are cited as sustaining this contention.

All of these cases involve controversies between the owners of trust funds, and parties who set up a title to such funds by transfer from trustees in fraud of their trusts, and where the paper transferred or assigned on its face gave notice of the existence of a trust. *Alexander* v. *Alderson, supra,* was a case of a note payable to Alexander, "trustee," by him assigned in payment of an individual liability, and the question there was, were the indorsees *bona fide* holders of the note, so as to be able to resist the claim of the beneficiaries? Upon the authority of *Duncan* v. *Jordan,* 15 Wall., 175, this Court held that the word "trustee" gave notice of the existence of a trust, and that the party taking the paper was charged with the duty of ascertaining what, if any, restrictions were imposed on the trustee in the management of the trust. To like effect are *Covington* v. *Anderson, supra,* and *Caulkins* v. *Gaslight Co., supra.* None of these cases, however, involve the question we have here. Similar to them is the case of the *Third National Bank of Baltimore* v. *Lauge,* 51 Md., 138 (S. C., 34 N. R., 304). There a trustee violated his duty by disposing of a note payable to himself, as trustee, and it was said by the Court: "It [the note] cannot be read understandingly without seeing upon its face that it is connected with a trust, and is a part of a trust fund. It was the duty of the bank, before purchasing it, to have made inquiry into the right of the trustee to dispose of it." The correctness of these holdings is now conceded

by the Courts with practical unanimity. The effect of them is that, if the trustee, Sykes, disposed of this paper in violation of his trust, then the word "trustee" would convert anyone who so obtained it into a constructive trustee, at the instance of the *cestui que trust.*

But it is certainly true, as Mr. Perry says, "the mere fact that the word 'trustee' is on the face of the securities cannot put a purchaser to any inquiry beyond ascertaining whether the trustee has power to vary the securities. If he has such power, a purchaser in good faith will be protected, although the trustee use the money for his private purposes. But if a purchaser takes securities from a trustee, with the word 'trustee' upon their face, in payment of a private debt due from the trusteee, the sale may be avoided by the *cestui que trust,* or the purchaser may be held as a trustee." 1 Perry on Trusts, Sec. 225. Here we find an intelligent statement of the rule and its limitations. The rule is, that he who takes a security from a trustee, with his fiduciary character displayed upon its face, is bound to inquire as to his right to dispose of it, but if, on inquiry, it is found that there is no restriction upon the trustee's power of disposition, or (it may be added) there is nothing in the nature of the transaction to indicate any abuse of his trust, then the title of a purchaser in good faith, for value and before maturing, will be protected.

In the case at bar, an inquiry would have dis-

closed that the word "trustee" in this connection
was purely descriptive and without any legal significa-
tion. That the trust deed executed by Col. Looney
and wife was in the ordinary form, made to Sykes,
as trustee, conveying to him certain real estate of
Mrs. Looney's, with this recital: "That, whereas
R. F. Looney, Sr., has subscribed $50,000 towards
the formation of a syndicate for the purchase of the
assets of the Sheffield Land, Iron & Coal Company,
and to this end has executed his two several prom-
issory notes for $12,500 each, due in six months
from date, payable to the order of Joseph P. Sykes,
trustee, which said two notes are a part of the
$50,000 subscription, now, in order to make cer-
tain the payment of said two notes, etc., we hereby
bargain and convey unto the said Joseph P. Sykes,
trustee," etc.

In other words, an examination would have dis-
closed, neither upon the face of this trust deed nor
elsewhere in the transaction, any restriction upon the
power of the payee, Sykes, nor any limitation upon
his right to indorse and turn over the note in ques-
tion for the consummation of Col. Looney's sub-
scription to the syndicate, but, on the contrary, that
it was made for that purpose, and none other. The
record showing that the note in suit, and the others
mentioned, were delivered to Mr. Sykes, the consti-
tuted representative of the syndicate, to be trans-
ferred by him in payment of Col. Looney's sub-
scription thereto, and that they were so used, and

that the note sued on passed, under the circumstances already detailed, into the hands of the cross-complainant bank, its title will be protected. This principle or rule was recognized by us in affirming the decree of the Court of Chancery Appeals in *Fox* v. *Citizens' Bank & Trust Co.*, 37 S. W. Rep., p. 1102. And see *Dunner* v. *Read*, 17 Minn., 493; *Davis* v. *Garr*, 6 N. Y., 124; *Westmoreland* v. *Foster*, 60 Ala., 448. But it is insisted that, at least, a settlement made between the United States National Bank and the Sheffield City Company, dated January 31, 1895, extinguished this note, so far as Looney and his accommodation indorser, Sykes, was concerned. It will be remembered that this note was transferred to its present holder by the Sheffield City Company, the last indorser. By the terms of the agreement, or settlement, as it is called, the Sheffield City Company was permitted to substitute with the bank certain securities it owned, in the place and stead of its guarantee or indorsement of this note, and the bank obligated itself not to sue on the guaranty or indorsement, but it was expressly stipulated that this settlement was in no way to affect the liability of the other parties to the note.

It was also agreed that as money was collected from the other parties, that it should be credited to the Sheffield City Company, and a like amount of its securities should be returned to it. In other words, this agreement simply substituted certain securities of the Sheffield City Company for its general liability

as indorser, and secured for it a dismissal of a suit then pending to enforce this liability, but in no way affected the relations of the other parties to this note.

This leaves undetermined alone the question of the extent of the obligation of J. P. Sykes on this note. Did the addition of the word "trustee" to his name limit his responsibility as its indorser? He waived demand and notice of protest by a writing when he indorsed it, so that his liability was fixed on the maturity and nonpayment of the note, unless it be that the addition of the word "trustee" relieves him. This question is settled against the indorser by a great weight of authority. *Taft* v. *Brester*, 9 John., 334 (6 Am. Dec., 280), was a case of parties signing a bond as trustees of the Baptist Society, etc., and the Court said: "The bond must be considered as given by the defendants in their individual capacity. It is not the bond of the Baptist Church, and if the defendants are not bound, the church certainly is not. The addition of "trustee" to the name of defendants is a mere *descriptio personarum.*" In *McClure* v. *Bennett*, 1 Blackford, 189 (12 Am. Dec., 223), makers of a note appended to their names the words "trustees of the First Presbyterian Church of Madison," and yet they were made personally liable. And in *Conner* v. *Clarke*, 12 Cal., 168 (73 Am. Dec., 529), the Court held that a party signing a note, with the word "trustee" added, was individually bound, and evidence was in-

admissible to show that, at the time he affixed his signature, there was an agreement that he should not be liable personally, but that the note should be paid out of a trust fund.

In this last case the Court quoted at length from Section 63 of Story on Prom. Notes, as follows: "As to trustees, guardians, executors and administrators, and other persons acting *en autre droit*, they are, by law generally, held personally liable on promissory notes, because they have no authority to bind *ex directo* the person for whom, or for whose estate, they act, and hence, to give any validity to the note, they must be deemed personally bound as makers. It is true that they may exempt themselves from personal responsibility by using clear and explicit words to show that intention, but, in the absence of such words, the law will hold them bound." To the same effect are *Burney* v. *Plumley*, 5 Vt., 500 (26 Am. Dec., 313); *Clapp* v. *Day*, 2 Me., 305 (11 Am. Dec., 99). So in this State it has been held that a note signed with the words "administrator or guardian" affixed to the name of the maker, is the latter's personal note. *Erum* v. *Carroll*, 1 Yer., 144; *McWherter* v. *Jackson*, 10 Hum., 208; *Carter* v. *Wolf*, 1 Heis., 694.

Now, does it affect the liability of the indorser on this paper, that the knowledge was communicated to the bank, when this note was delivered to it, that Mr. Sykes had no interest in the transaction of which it formed a part? For it is clear that notice

to a bank discounting accommodation paper that the indorser is lending his credit to the maker, does not affect the bank or relieve the indorser. *Phillen* v. *Patterson*, 168 Pa. St., 468 (47 Am. St. Rep., 896).

The result is, the Chancellor's decree dismissing the cross bill of the United States National Bank, and sustaining the respective cross bills of Looney and wife and Sykes, and of Buchanan and others, is reversed, and a decree will be entered here, in accordance with the prayer of the first one of these cross bills, in favor of the United States National Bank.