United States Fidelity & Guaranty Company v. Adoue & Lobit.

No. 2169. Decided May 24, June 23, 1911.

**1.—Limitation—Insanity—Subrogation.**

Limitation did not run against the claim of an insane person for misappropriation of his estate by a bank in which his funds had been deposited; nor run against a surety on the guardian's bond, compelled to answer for the money so misappropriated by the guardian and the bank and subrogated to the claim of the state against the bank, until his cause of action arose by his making good the guardian's default. (P. 389.)

**2.—Guardian's Bond—Surety—Subrogation.**

A surety on a guardian's bond compelled by judgment to pay for the principal's default is subrogated to the right of action of the estate of the ward against a bank which had permitted funds of such estate deposited as guardian to be misapplied in payment of the personal debt of the guardian to the bank. (P. 389.)

**3.—Bank—Guardian—Deposit of Trust Funds—Misappropriation—Notice.**

A bank which receives from a guardian money belonging to the ward's estate upon certificate of deposit in the name of the depositor as guardian, is charged with notice from the form of deposit that it is dealing with a trust fund, though without other notice of the character of the fund, or that the depositor is a guardian, or for whom. It may not refuse payment of the certificate to the guardian or to one to whom he has indorsed it, nor is it bound to look to the application of the fund after it is drawn out. But if it permits the guardian to appropriate such deposit to the discharge of a debt owing to itself by him personally, or of other personal debts of the guardian, it becomes a party to the misappropriation and liable to the estate for such diversion of its funds. (Pp. 389-392.)

**4.—Same—Case Stated.**

A guardian of the estate of an insane person was in arrears to the amount of $11,913.83, and under the necessity of giving a new bond. He borrowed and deposited in bank $5000, and secured a loan of the balance from the bank on securities, taking a certificate of deposit in his name as "guardian" which, with the securities, was placed in the bank, a receipt being taken showing it to be held subject to the control of his sureties to whom he endorsed the certificate. On this showing of cash on hand as guardian he secured approval of his accounts by the court, induced other sureties to execute a new bond, and procured the discharge of the former bondsmen. By consent of these discharged bondsmen he then obtained from the bank the securities and certificate left subject to their order, surrendered the certificate, received discharge of his personal debt to the bank of $6,913.83, and was credited with a deposit of $5000 as made by himself personally, which on the same day he paid out on check to discharge the debt for $5000 borrowed from the other party. Held, that by the first transaction the guardian effected a restitution of the money owing the estate; the deposit on certificate became the property of the estate; the bank was charged with notice, from the terms of the certificate, that it was a trust fund which the guardian could not use to discharge his personal debts; it became a party to the misappropriation when it permitted him to use the fund for its benefit in the discharge of his personal debts to it and to another; the first bondsmen having been released and the new bondsmen held for the guardian's default (Moore v. Hanscom, 101 Texas, 293) the latter were subrogated to the right of action of the estate of the ward against the bank and could recover from it the amount of the trust fund so improperly diverted. (Pp. 381-392.)

· ON MOTION FOR REHEARING.

**5.—Same—Notice.**

As to the $5000, the part of the proceeds of the certificate of deposit placed to the personal credit of the depositor and paid out on the same day by his check to a creditor other than the bank, it would seem that his misappro-

priation of the rest of the fund to payment of his debt to the bank would give color to this transaction also; but aside from this, the action of the bank in permitting the transfer of the deposit from his account as guardian to his personal account and its disposition by his personal check was sufficient to render it liable as a party to the diversion of the fund. (Pp. 393-395.)

Error to the Court of Civil Appeals, First District, in an appeal from Galveston County.

The United States Fidelity & Guaranty Co. of Baltimore, Md., brought the suit against Adoue & Lobit. Defendants had judgment. Plaintiff appealed and on affirmance obtained writ of error.

*Hunt, Myer & Townes, Geo. G. Clough* and *Hunt, Myer & Teagle,* for plaintiff in error.—The Court of Civil Appeals and the trial court erred in holding that the word "guardian," on the certificate of deposit issued to A. J. Compton, and which word followed the name of A. J. Compton, was not sufficient, under the facts in this case, to charge defendants in error with notice that the said certificate represented money and trust funds belonging to the estate of Menard James, a non compos mentis, and that said certificate and the moneys represented thereby was held in a fiduciary capacity by said A. J. Compton. Moore v. Hanscom, 101 Texas, 293; Gillespie v. Crawford, 42 S. W., 624; Brown v. Fidelity & Dep. Co., 98 Texas, 62; Hurst v. Marshall, 75 Texas, 454; Daniel, Neg. Inst., secs. 789, 789a, 795b; Daniel, Neg. Inst. (4th ed.), sec. 271; Eaton & Gilbert on Com. Paper, sec. 75d, p. 370; Tiedman on Com. Paper, sec. 390; Perry on Trusts, sec. 225; Ford v. Brown, 1 L. R. A. (N. S.), 188; Duckett v. Bank, 39 L. R. A., 84, 64 Am. St., 513; Lang v. Metzger, 86 Ill. App., 117; Third Nat'l Bank v. Lang, 51 Md., 138, 34 Am., 304; Nicholson v. Chapman, 1 La. Ann., 222; Bank v. Looney, 99 Tenn., 278, 38 L. R. A., 837; Fox v. Bank, 37 S. W., 1132, 35 L. R. A., 631; Guyser v. Stark, 53 L. R. A., 688; 7 Cyc., p. 951; 28 Am. & Eng. Ency. Law, p. 1129; Cahnfield v. Tannenbaum, 176 N. Y., 126; Gerard v. McCormick, 130 N. Y., 261; Shaw v. Spencer, 100 Mass., 393, 97 Am. Dec., 107; Bank v. Jones, 18 Texas, 811; Hill v. Fleming, 107 S. W., 764; Prather v. Weissiger, 10 Bush (Ky.), 117; Pennington v. Smith, 24 Cir. Crt. App. (U. S.), 145; Coleman v. Hercksher, 185 Pa. St., 476; Harrison v. Fleishman, 70 N. J., Eq., 301; Interstate Bank v. Claxton, 97 Texas, 569; Duncan v. Jaudon, 15 Wall. (U. S.), 165; Anderson v. Walker, 93 Texas, 119.

Mere application of deposits on a preexisting debt is not sufficient to entitle a bank to the defense of "bona fide" purchaser. Union Stock Yards v. Gillespie, 137 U. S., 411; Van Alen v. Am. Nat'l Bank, 52 N. Y., 1; Nichols v. Martin, 35 Hunt, 168; Dickerson v. Tillinghast, 4 Paige, 221.

Plaintiff in error having been compelled, as a surety on the guardianship bond of A. J. Compton, to make good to the estate of Menard James the amount of Compton's defalcation, or misappropriation, of the fund represented by the certificate of deposit, it is subrogated to the rights of said estate against Adoue & Lobit. Browne v. Fidelity & Deposit Co., 98 Texas, 62; Skipwith v. Hurt, 94 Texas, 322; Anderson v. Walker, 93 Texas, 119; Gillespie v. Crawford, 42 S. W., 624;

Rowland v. Manons, 8 Ky. Law Rpt., 317; Bank v. Fidelity & Deposit Co., 56 S. W., 671; Caviness v. Fidelity & Deposit Co., 140 N. C., 58; Bank v. United States, 164 U. S., 227.

*Jas. B. & Chas. J. Stubbs* and *James H. Robertson,* for defendants in error.—The word "guardian," after the name of A. J. Compton, on the certificate of deposit, was not sufficient to charge defendants with notice that it represented money belonging to the estate of Menard James, and that it was held in fiduciary capacity by Compton. Notice to Adoue & Lobit, actual or implied, that Compton was a guardian, or a guardian of an estate, would not have justified them in withholding from him the money and securities that he had placed in the bank in order to obtain the certificate. As defendants returned the deposits, they thereby gave a valuable consideration for the return of the certificate and can not rightfully be compelled to again pay it, or its value, and they stand in a very similar if not identical relation to that occupied by a purchaser for value in good faith of commercial paper. But whether defendants be deemed such purchasers, without any notice of superior equities, or as merely having performed the duty of a banker by restoring to the depositor his deposits upon return of their receipt, the result is the same, and defendants are entitled to the same protection. A recent case by this court meets this situation fully. Silsbee State Bank v. French M. G. Co., 132 S. W., 465, decided December 14, 1910, holds that a deposit in a bank to the credit of Ray Miller, agent, was prima facie his own. Roundtree v. Stone, 81 Texas, 299; Crawford v. Wilcox, 68 Texas, 110; Abercrombie v. Stillman, 77 Texas, 589; Hall v. Pearman, 20 Texas, 171; Claiborne v. Yoeman, 15 Texas, 44; Rider v. Duval, 28 Texas, 623; 4 Thomp. Corp., sec. 5129; 2 Morse Banks, sec. 432; Fletcher v. Schaumburg, 41 Mo., 501; Powell v. Morrison, 35 Mo., 244; Ranney v. Brooks, 20 Mo., 105; Bank v. Claxton, 97 Texas, 572; Sparrow v. State Exch. Bank, 77 S. W., 168; Westmoreland v. Foster, 60 Ala., 448; Fountain v. Anderson, 33 Ga., 372; Jenkins v. Sherman, 77 Miss., 884; Bank v. Hyde Park, 101 Ill., 595, 15 L. R. A. (N. S.), 310; Cunningham v. Bank, 10 L. R. A. (N. S.), 706; Brewster v. Syme, 42 Cal., 139; Thompson v. Toland, 48 Cal., 99; Kimmel v. Bean (Kan.), 64 L. R. A., 785; School District v. Bank, 102 Mass., 174; McEwen v. Davis, 39 Ind., 109; Wood v. Bank, 129 Mass., 358; Zellner v. Cleveland, guardian, 69 Ga., 633; Mayer v. Bank, 86 Mo. App., 108; Bank v. Life Ins. Co., 104 U. S., 54; Bank v. Gillespie, 137 U. S., 411; Morse on Banks, vol. 1, sec. 226; Morrison v. Hodges, 25 Texas Supp., 177; Traynam v. Jackson, 15 Texas, 170; Gibson v. Irby, 17 Texas, 174.

If the court shall hold that the loan was made to Compton personally and not as guardian, then it would seem that the defendants in error, in any event, would not be liable for any amount in excess of the amount of money applied to the extinguishment of the loan, viz., $7,000, and interest thereon. Bank v. Claxton, 97 Texas, 576; Coleman v. Bank, 94 Texas, 607.

Mr. Justice Ramsey delivered the opinion of the court.

For the purposes of this opinion we adopt the statement of the case

made by the Court of 'Civil Appeals. While quite lengthy it can not be well abbreviated. It is as follows:

"This suit was brought by the appellant against the appellees, Adoue & Lobit, a banking firm composed of B. Adoue and Joseph Lobit, to recover of said firm, and of the individual members thereof, the sum of $11,939.83, with interest thereon at the rate of six percent per annum from March 7, 1903, together with the court costs paid by appellant in a suit bought in the District Court of Galveston County by S. S. Hanscom, guardian, against appellant and other sureties upon the bond of A. J. Compton, guardian of the estate of Menard James.

"The petition alleges in substance that on March 3, 1903, the appellant became surety upon the bond of A. J. Compton, guardian of the estate of Menard James, a lunatic, said guardianship being then pending in the County Court of Galveston County; that prior to the time appellant became such surety the said guardian had deposited with the appellee bank· the sum of $11,913.83, which was all of the cash assets of said estate, and as evidence of such deposit appellee bank, on October 20, 1902, executed and delivered a certificate of deposit in said amount in favor of A. J. Compton, guardian, and payable to his order; that after appellant became surety for said guardian he endorsed and delivered said certificate to appellees on or about March 7, 1903, and they cancelled same and appropriated the proceeds thereof to the payment and satisfaction of an individual indebtedness due them by said Compton; 'that appellees, at the time of the deposit of said money, and the issuance of said certificate to A. J. Compton, guardian, and at all times thereafter, had full knowledge and notice that the said deposit and said money represented by the certificate was not the individual property of A. J. Compton, but that it was, and continued to be, the property of said estate, of which A. J. Compton was the duly qualified and acting guardian, and that by reason of the premises, Adoue & Lobit, when they knowingly applied said sum as before stated, knowingly misapplied, misappropriated and converted the same to their own uses, and thereby became indebted, liable to and bound to pay said estate the said sum so converted, together with six percent interest from date of conversion, and that upon the death of said Menard James they became liable and bound to pay the temporary administrator, as aforesaid, but they have failed and refused to pay same; that said sum of money was never restored to or repaid said estate by the said Compton, and after the death of said guardian and of said lunatic, in a suit against appellant and other sureties of said guardian, judgment was rendered against appellant for said sum, and in satisfaction of said judgment appellant has paid to the administrator of said estate said sum of $11,913.85, with legal interest thereon from the date of its conversion by appellees, as aforesaid, and that by reason of such payment appellant has become and is subrogated to the rights of said estate against appellees.'

"The defendants answered by a general exception, various special exceptions (which were overruled), a general denial and special pleas, in substance, as follows:

" '1. That said certificate and the money or credit it represented were not the assets of said estate, nor were same deposited with de-

fendants as such, nor were they deposited by A. J. Compton as guardian of said estate, or in his capacity as such, nor were defendants ever notified by any person, or in any manner, that Compton made such deposit, or any deposit, as guardian of said estate, nor that the certificate or what it represented belonged to said estate, or was claimed to belong thereto, and that they deny that they ever had any knowledge or notice, actual or constructive, that such certificate, or what it represented, was the money or property of said ward's estate, or was claimed to be such, or in any manner concerned therewith, until about March, 1905, or later. That said certificate was issued under the following circumstances: A. J. Compton placed with, or caused to be sent to, defendants $5,000, loaned him by his brother, and arranged with defendants for a credit of about $6,913.85, to secure which he deposited collaterals and securities, sufficient in amount and value to protect them in said loan, and based upon said two transactions defendants issued the certificate described in plaintiff's petition. That upon the return, surrender and cancellation of said certificate, about March 7, 1903, defendants delivered to said Compton said securities, and shortly after paid his check for $5,000, without any knowledge or notice, actual or constructive, that either said certificate, or the money or credit represented by it, or the $5,000 deposited by or for said Compton and paid out as above stated, and the credit or loan advanced by defendants, were the property and assets of any person or estate, other than of the defendants or A. J. Compton, as the case may be. That they did not know that he was guardian of an estate, or that he was a guardian of any kind, or in any capacity, nor did they know actually or constructively, that any claim other than by or through Compton individually, was, or would be, asserted to said certificate, or said funds and credit, and that said certificate issued by them was reacquired by them for a valuable consideration, without notice of any adverse claim thereto, or to that which it represented, and that they were innocent purchasers thereof, at or before maturity and entitled to protection as such. That so far as the certificate or the money which it represented being the property of said estate, that same was or represented in law and equity defendants' property, or that of Compton, or person other than James, as none of it ever came from said estate, directly or indirectly, or was ever owned by it, but that if same was in legal contemplation the property of said estate, then they say that they had no intimation, knowledge or information of such fact, and were not put upon inquiry, and were not only justified but required by law to redeem said certificate and pay out said $5,000, as was done, and return to said Compton that which they had received from him, and that they can not and should not be required to pay the same a second time, as Compton's estate is insolvent, and that they would have lost their debt and securities if they had pursued any other course.

"'2. That if said Compton was ever short in his account with said estate, the same occurred long before any of the transactions before described, and that they never knew, actually or constructively, that the same was claimed or was the fact until several years after they had redeemed said certificate and paid out the money and returned said securities, and that it would be unjust and inequitable, after they

had parted with a valuable consideration in the redemption of same, to require them, without the return of such cash and collaterals, to again pay the amount of said certificate, and that they are entitled to be restored to the position they occupied prior to the redemption or payment of said certificate.

" '3. That they deny they ever knew or were informed, directly or indirectly, that said Compton had represented to plaintiff or its agent that the certificate or fund represented by it, was the property of said estate, or was held by him in his capacity as guardian thereof, and they deny that Compton as guardian of said estate ever had any account with them, or any credit extended to him in such capacity, and that the word guardian following his name upon said certificate and upon any entry in their books, was a mere *descriptio personae,* and did not and could not advise ·them of any of the matters alleged as constituting knowledge or notice that the money or certificate, or both, belonged to said estate, or were assets thereof.

" '4. That the plaintiff, in the former suit described in its petition, asserted that the shortage occurred long prior to the issuance of said certificate, and that no restitution was ever made by Compton, and that plaintiff should not now be allowed to assume an inconsistent and contrary position, but held to such assertion.

" '5. They plead the two years and four years statutes of limitation against plaintiff's demand.

" '6. That plaintiff is a bonding and guaranty company for compensation.'

"The plaintiff replied to the foregoing answer, by a general exception, special exceptions, general denial, and specially, in substance, as follows:

" '1. That on October 20, 1902, said Compton was short in his guardianship accounts to the amount of $11,913.83, and that said certificate was obtained for the purpose of replacing the funds theretofore embezzled by him, and that said certificate, together with other assets of said estate, were thereupon delivered to said Marx and Moore to be held by them while sureties upon the guardianship bond of said Compton, and on said same day, after being endorsed to them by said Compton, as guardian of said estate, said certificate, together with all the assets of said estate, were delivered to Adoue & Lobit as trustees, who held same as such until about March 7, 1903. That by the issuance of said certificate Adoue & Lobit placed it in the power of said Compton to repay the money which he had theretofore embezzled from said estate, and said Compton did so replace same, and by reason thereof said certificate, and its proceeds, became the property of said estate. That at all times·after the execution and delivery of said certificate, said defendants, and each of them, had both actual and constructive knowledge and notice of the ownership of said certificate, and of the money it represented, and, if ·not, that they had notice of such facts as would have put a person of ordinary care and prudence upon notice and investigation of the true facts, and from an investigation of such facts they would have learned that said certificate and the money represented thereby was the property of said estate, and they

are now estopped to claim that they did not know that said certificate and the money it represented was the property of said estate.

" '2. That at the time of the conversion of said certificate and the money it represented, and long prior thereto, the said Menard James was *non compus mentis,* and a lunatic, and continued to be such until his death, about March 19, 1906, and that, under the statutes of limitation, neither the two nor the four years, nor any other statutes of limitation, run against lunatics or persons of unsound mind, and that after the death of said Menard James, the statutes of limitation were suspended for one year, or until the appointment and qualification of his administrator. That the instrument herein sued upon was payable to A. J. Compton as guardian, and that the real beneficiary was the said Menard James, as aforesaid, and no statute of limitation, if ever put in operation, had run in favor of defendants prior to the filing of this suit.

" 'That the statutes of limitation could not begin to run against plaintiff's cause of action, because same is based upon a trust, and that defendant held said money in trust for the benefit of said estate.

" 'That the statutes of limitation did not begin to run against plaintiff until it was forced to pay the indebtedness which is the basis of this action, which was done about March 14, 1908. That plaintiff is subrogated to all the rights of said Menard James, *non compos mentis,* and his estate, and by reason thereof it is entitled to the benefit of the exception made in the statutes with reference to persons of unsound mind.'

"The cause was tried in the court below without a jury and resulted in a judgment in favor of defendants.

"The following findings of fact by the trial court are supported by the evidence and are adopted as our fact conclusions:

" 'On the 20th of October, 1902, A. J. Compton obtained from Adoue & Lobit, bankers at Galveston, a cash advance of about $7,000, on open account, against collaterals regarded by them as of sufficient value to secure the amount. On the same day, against the $7,000 so advanced, and upon the faith of a dispatch to them from the cashier of a bank in Houston, to the effect that the Houston bank had forwarded them their check for $5,000, payable to Compton's order, he procured from them a certificate of deposit, reading as follows:

#### " 'ADOUE & LOBIT, BANKERS.

$11,913.83.                    Galveston, Tex., Oct. 20, 1902.

" 'A. J. Compton, guardian, has deposited with us in cy. eleven thousand nine hundred thirteen and 83/100 dollars, payable to the order of himself on return of this certificate, properly endorsed.

No. 1895.                              (Sgd.) Adoue & Lobit.

Endorsed: A. J. Compton, Guardian.'

"The certificate was charged by Adoue & Lobit to Compton's personal account, absorbing the credit items named. Compton had only two accounts with them, one as county treasurer and the other per-

sonal. He at no time had any account with them as guardian of any estate. No other entry was made on the books of Adoue & Lobit of the certificate, save as above, except its notation in the list of certificates of deposit, showing that a certificate of deposit, payable to A. J. Compton, guardian, was an outstanding liability of the bank.

"Compton was, and had been for a year or more before this transaction, a defaulter in his account as guardian of the estate of Menard James, *non compos mentis,* an estate being administered in the County Court of Galveston County, for about $12,000. His purpose in obtaining the certificate was to cover up the defalcation. Pursuant to this purpose, on the day of its issuance, he exhibited the certificate to the county judge to procure the approval of his account showing a corresponding cash balance on hand. His bond as guardian had been originally fixed by the county judge at $20,000, and afterwards raised to $76,113.66, which he had not given at the time of the issuance of the certificate. He contemplated at the time securing its reduction to about $30,000, and procuring plaintiff's suretyship on his bond when it should be thus reduced. On the same day, October 20, he exhibited the certificate to the local agent of the plaintiff, a surety company, in verification of the correctness of his account as guardian. He exhibited the certificate, also on the same day, to M. Marx and C. H. Moore, to give them assurance of the correctness of his accounts and procure their signatures as sureties on the $76,113.66 bond, pending the application for its reduction. He at the same time exhibited to Marx and Moore all the other personal property of the estate, consisting of wharf and gas company stock issued to Menard James, estate of Menard James, and Compton, guardian; and upon his endorsing the certificate of deposit to them, and agreeing to deposit it, together with the certificates of stock, with Adoue & Lobit, subject to the order of Marx and Moore, they signed his bond. Mr. Moore accompanied Mr. Compton to Adoue & Lobit's bank, having first prepared a receipt for them to sign. Moore and Compton stated to Mr. Lobit that they wished to leave the papers with them for safekeeping, or as a special deposit, and asked him to sign the receipt. He did so and placed the envelope containing the securities in their safe. The receipt is as follows:

"'Galveston, Texas, October 20, 1902.

"'Received of C. H. Moore and M. Marx one unsealed envelope, containing one certificate of deposit, No. 1895, signed by Adoue & Lobit to the order of A. J. Compton, Gdn., properly endorsed for amount of eleven thousand nine hundred thirteen and 83/100 dollars; also certificate No. 1335 for twenty-six shares of Galveston Gas Co. stock and certificates Nos. 3254-73 shares, 820-2 shares, 845-31 shares, 876-20 shares, 998-10 shares, 562-17 shares and 1045-20 shares, representing in all 173 shares of Galveston Wharf Co. stock, to be delivered only on an order signed by C. H. Moore and M. Marx, or their administrators.

"'Original.                                    Adoue & Lobit.'

"On the 20th of February, 1903, Compton obtained the reduction of his bond to $30,000, and the signatures thereto of the plaintiff as his

surety, which was approved by the county judge on the 3d day of March, 1903. On the 7th day of March, 1903, he presented to Adoue & Lobit the order of Marx and Moore for the delivery to him of the package of securities left with them, as above stated. The order is in the following form:

" 'Galveston, Texas, March 4, 1903.

" 'Messrs Adoue & Lobit,
    Galveston, Texas.
    " 'Gentlemen: Please deliver to Mr. A. J. Compton the following papers left with you for our account, viz.:
    " 'Certificate of deposit No. 1895 for $11,913.83.
    " 'Certificate No. 13325, 26 shares Gas Co. stock.
    " 'Certificates Nos. 3524, 820, 845, 998, 562 and 1045, Wharf Co. stock, aggregating 173 shares.
                    Yours truly,
                        C. H. Moore, M. Marx.'

"Adoue & Lobit thereupon delivered the package to Compton, and he, having first erased the names of Marx and Moore from his endorsement, leaving thereon his endorsement, 'A. J. Compton, Guardian,' requested them to cash it by crediting it to his account. They did so, thus repaying themselves their advance of $7,000 and leaving a balance of proceeds to Compton's credit of $5,000, which he shortly afterwards withdrew by check. At the same time they returned to him his collaterals.

"There was no agreement that the money called for by the certificate was to remain in the hands of Adoue & Lobit, or that the certificate was to be returned to their custody, or that it was not to be negotiated. Adoue & Lobit would have paid it at any time over the counter in cash on its presentation, endorsed by Compton in the words, 'A. J. Compton, Guardian.'

"Adoue & Lobit did not know, at the time of any of the events stated, that Compton was guardian of the estate of Menard James, as above stated, in obtaining the certificate of deposit; and when presented for payment, March 7, 1903, knew nothing of the use he had made of it, either its exhibition to the county judge, to plaintiff's local agent, or the agreement with Marx and Moore. They had no knowledge or information on these subjects until the facts were developed by the suit against Compton's sureties as guardian of the estate of Menard James in 1905. When the package was brought them for safekeeping by Moore and Compton, Mr. Lobit did not take the papers out of the unsealed envelope, but glanced at the corners sufficiently to satisfy himself that the shares of stock called for by the receipt were there. He also recognized their certificate of deposit. He made no inquiry. His suspicions were not in any way aroused. The relations of Adoue & Lobit to the transaction were exclusively through Mr. Lobit. They received no pecuniary profit from it and contemplated none. They charged no interest on the $7,000 advanced, and acted throughout to oblige a customer whose account as county treasurer was valuable to them as bankers.

"Compton died on the 1st day of November, 1904. His estate is notoriously insolvent. Suit was instituted by the legal representatives of the estate of Menard James against Compton's estate, and against three sets of sureties on his bond as guardian, and judgment recovered against the plaintiff, as surety on the last bond, on the 22d day of January, 1908, in the Supreme Court, Moore et al. v. Hanscom, 106 S. W., 876. Plaintiff has since paid the judgment, amounting to $14,361.60.

"The plaintiff sues Adoue & Lobit, alleging the appropriation and conversion of the certificates; also, that it had not been paid and was due the estate of James, and claiming subrogation to the rights of the estate of Menard James against them.

"I find that Adoue & Lobit acted throughout the transaction in good faith; that they regarded the certificate of deposit as the private property of A. J. Compton; that the facts known to them were not such as to affect them with notice, or excite the suspicion of a person of reasonable or ordinary prudence and put him on inquiry.

"If the defendants are affected with notice that the certificate was or represented fiduciary funds, proper inquiry would have developed that Compton was the legally appointed guardian of the estate of Menard James, and that his accounts on file showed he should have on hand the amount of money called for by the certificate."

To get the questions before our minds in order, it may be well to briefly restate some of the dates of the happening above set out and other matters apparent of record and not at all in dispute. The original certificate of deposit issued by Adoue & Lobit to A. J. Compton, Guardian, was dated on October 20, 1902. The receipt issued by them to C. H. Moore and M. Marx for this certificate, payable to Compton as guardian and for certain stocks therein described, was dated the same day. On the next day, October 21, 1902, Moore and Marx became sureties on Compton's guardianship bond in the sum of $76,113.66. On March 3, 1903, the plaintiff in error became sureties on said guardian's bond in the sum of $30,000. On March 7, thereafter, the certificate of deposit issued to Compton as guardian was surrendered to Adoue & Lobit and in part extinguishment of the liability therein recognized and thereby created, his personal debt to the bank was extinguished, his securities returned to him and his personal account was credited with the balance thereof, to wit, $5,000. It also appeared from the testimony of Compton's brother that his debt of $5,000 was repaid to him on that day. It was shown that Compton represented not only to Moore and Marx, but also to the county judge of Galveston County that all the cash belonging to his ward's estate was on hand and intact and as evidence thereof produced the certificate of deposit in question. This was a restoration of the funds of the ward which had theretofore, it seems, been dissipated, and these acts of Compton unequivocally stamped such fund with a trust character. On March 3, 1903, when plaintiff in error became his surety the condition of the ward's estate, at least as to the fund in question, was unchanged. The ward's money was on hand and on deposit to his credit as guardian in a solvent bank. On March 7, 1903, it was all gone, and had by him been misapplied to the payment of his personal debts.

The question before us is whether under the facts stated plaintiff in error can recover of the bank.

1. It was correctly held, by the trial court, that limitation had not, at the time of the institution of the suit, barred the company's claim, if such right of recovery existed. This seems so clear that we do not feel called on to discuss that question.

2. We think the conclusion of the learned trial court equally sound that the plaintiff in error was subrogated to all the rights of the ward or his estate, and that if the administrator of the estate of the ward could, under the facts in the case, recover against Adoue & Lobit, that a recovery should also be adjudged in its favor.

3. The principal question in the case is, were Adoue & Lobit charged with notice of the trust character of the funds in question and were their acts and conduct in relation to same such as to render them liable? This, we think, must be answered in the affirmative. Such was clearly the effect and fair purport of the decision of this court, rendered on the 22d of January, 1908, in the case of Moore v. Hanscom, 101 Texas, 293, 106 S. W., 876. The facts of that case, so far as essential to a decision by us now, are practically identical with the facts in the present record. It was there said: "When Compton deposited in the bank of Adoue & Lobit the sum of money due to the estate of Menard James, and the money was entered to the credit of A. J. Compton, guardian, the fund so deposited became the money and property of the ward's estate. Anderson v. Walker, 93 Texas, 119, 53 S. W., 821; Skipwith v. Hurt, 94 Texas, 322, 60 S. W., 423. Lobit testified that the bank would have paid the money on presentation of the certificate of deposit by Compton, or by any person holding it with Compton's endorsement on it. Adoue & Lobit were notified by the fact that Compton made the deposit as guardian that the money belonged to the estate of the ward, and they could not lawfully pay it to any person except by Compton's order, and then only for the uses of the estate; that is, they could not have knowingly applied the money in their hands to the payment of any order made by Compton in any other character than that of guardian, nor could they have applied the money to the payment of any debt due from Compton personally to them, or to any other person. The fact that the certificate of deposit, with the stocks mentioned, were placed in the hands of Moore and Marx to be preserved for the estate, so long as they were upon the bond, did not affect the title of the estate to the money, but, on the contrary, evinces a purpose to preserve it for the benefit of the estate, and, in their hands as such securities, the money was in law in the possession of the estate and belonged to the estate. Johnson v. Jones (Ky.), 68 S. W., 14." This is in accordance with the rule which obtains generally and which is thus stated in volume 2, section 1612a of Daniel on Negotiable Instruments: "If a deposit be made in bank to the credit of a certain person as agent or trustee, the use of such terms would charge the bank with notice that the funds were there in a fiduciary relation; it would have no lien upon them for the private debts of the depositor, and if it permitted them to be used for his private purposes in transactions with the bank it would be bound." The same doctrine is recognized by Perry on Trusts where it is said:

(vol. 1, p: 279): "But if a purchaser takes securities from a trustee, with the word trustee upon their face, in payment of a private debt due the trustee, the sale may be avoided by the *cestui que* trust, or the purchaser may be held as a trustee." In support of the text the author refers to the leading case of Shaw v. Spencer, 100 Mass., 382, 97 Am. Dec., 107, 1 Am. Rep., 115, where it was held that if a certificate of stock expressed in the name of "A. B. trustee," is by him pledged to secure his own debt, the pledge is by the terms of the certificate put on inquiry as to the character and limitation of the trust, and if he accepts the pledge without inquiry, does so at his peril. The rule is thus expressed in vol. 7, Cyc., p. 951: "Expression of Fiduciary Relationship in Signature or Indorsement. The expression of a fiduciary character of a holder or transferrer on the face of a negotiable instrument is notice to the purchaser of a probable limited or restricted authority to negotiate the same. This is so where paper is signed or indorsed by an agent as such, especially where the paper is made payable to him as agent or where it appears on the face of the paper by the indorsement to the holder or by other papers or orders accompanying the note that the transferrer has the instrument as trustee or guardian or in some other official capacity, although it has been held that where it is not shown either by the note or otherwise that a fiduciary relationship exists, except by word or phrase descriptive of the person, such terms should be considered as *descriptio personae,* and will not constitute notice to the purchaser of a probable limited authority to make the transfer." It will be noted that the rule of *descriptio personae* seems limited to Missouri. A very clear statement of the law is contained in volume 28, Am. & Eng. Ency. of Law, p. 1129, where the author says:

"The circumstances sufficient to affect a purchaser with constructive notice are scarcely susceptible of classification, since each case is recognized as determined by its own facts. It is, however, generally admitted that where the instrument of transfer or a paper which constitutes evidence of property, such as a check, note, or stock certificate, indicates on its face that the property transferred is held in trust, a purchaser or pledgee takes with notice of the trust.

"Use of word 'trustee.' Ordinarily the words 'trustee' or 'in trust' or 'guardian,' contained in a deed, mortgage, assignment or indorsement, are deemed sufficient to put a transferee on inquiry. It has, however, been held that such words alone are not sufficient to give notice that a breach of trust is about to be committed, and that it is. necessary for the purchaser to inquire whether the circumstances of the case constitute reasonable ground to conclude that a fraud is contemplated."

Indeed the law seems well settled both in England and America in accordance with the holding of this court in Moore v. Hanscom, supra. But it is contended that the doctrine of the law merchant in respect to negotiable instruments has in the case a controlling effect. That Adoue & Lobit were by law compelled to pay the certificate when presented by Compton, or if presented by another with his proper endorsement, and that as such payment could be enforced, they were authorized in paying same, should be protected in so doing, and would not be liable for a subsequent misappropriation of the fund by Comp-

ton. This general rule is recognized in the decisions which hold that a bank can not apply such trust fund to the payment of the personal debts of the trustee or guardian or permit its diversion to the personal use of such guardian. Thus in Duckett v. National Mechanics' Bank, 86 Md., 400, 39 L. R. A., 84, 63 Am. St., 513, it was said: "It is immaterial, so far as respects the duty of the bank to the depositor, in what capacity the depositor holds or possesses the fund which he places on deposit. The obligation of the bank is simply to keep the fund safely and to return it to the proper person, or to pay it to his order. If it be deposited by one as trustee, the depositor, as trustee, has the right to withdraw it, and the bank, in the absence of knowledge or notice to the contrary, would be bound to assume that the trustee would appropriate the money, when drawn, to a proper use. Any other rule would throw upon a bank the duty of inquiring as to the appropriation made of every fund deposited by a trustee or like fiduciary; and the imposition of such a duty would practically put an end to the banking business, because no bank could possibly conduct business if, without fault on its part, it were held accountable for the misconduct or malversations of its depositors who occupy some fiduciary relation to the fund placed by them with the bank. In the absence of notice or knowledge a bank can not question the right of its customer to withdraw funds, nor refuse (except in the instances already noted) to honor his demands by check; and, therefore, even though the deposit be to the customer's credit in trust, the bank is under no obligation to look after the appropriation of the trust funds when withdrawn, or to protect the trust by setting up a *jus tertii* against a demand. But if the bank has notice or knowledge that a breach of the trust is being committed by an improper withdrawal of funds, or if it participates in the profits or fruits of the fraud, then it will be undoubtedly liable. In support of these general principles, if support they need at all, we may refer to Munnerlyn v. Augusta Sav. Bank, 88 Ga., 333, 30 Am. St., 159; State Nat. Bank v. Reilly, 124 Ill., 464; Essex County Chosen Freeholders v. Newark City Nat. Bank, 48 N. J. Eq., 51, all cited in 3 Am. & Eng. Ency. Law, (2d ed.), pp. 833, 834; Walker v. Manhattan Bank, 25 Fed. Rep., 255; 1 Morse, Banks & Banking, para. 317; Swift v. Williams, 68 Md., 237." And then in full recognition of the general rule contended for by defendants in error the same court further says: "Precisely for the reasons that the bank is not responsible for the misappropriation of the proceeds of the first check, it is liable to the new trustees for the misapplication by Clagett of the fund collected by it on the second check. The second, or Duckett check, in terms directed the cashier of the Mechanics' Bank 'to deposit' the $2,024.30 'to the credit of Henry W. Clagett, trustee.' This was an explicit notification to the bank that Clagett was not the actual owner of the money. Bundy v. Monticello, 84 Ind., 119; 3 Am. & Eng. Enc. Law, (2d ed.), p. 832. It was an equally explicit instruction to the bank not to place the funds to the credit of Clagett's personal account. It was consequently more than a mere memorandum made for the convenience of the drawer of the check. Knowing that the money was not Clagett's, but that it was payable to him, and to be deposited to his credit as trustee, the bank had no authority to place it to his

individual credit. (American Exch. Nat. Bank v. Loretta Gold & S. Min. Co., 165 Ill., 109, 56 Am. St., 233) ; and if loss ensued by reason of Clagett drawing the fund out by checks on his personal account, the bank is liable to make restitution to the trust estate. The bank in the eye of the law participated in the breach of trust of which Clagett was guilty. In fact, the bank took the first step that ended in the spoilation of the trust. Its act in placing distinctly marked trust funds to the personal credit of Clagett was obviously wrongful, and it must bear the resulting consequences." So that, to the suggestion of the Court of Civil Appeals that a bank which pays trust funds on the order of a guardian in the customary way in which such business is conducted "should not be held liable for the misappropriation by the guardian of the funds so paid by the bank," the answer is obvious that such rule can have no application where the bank, visited as it was, as a matter of law, with the trust nature of the funds in its possession, participated actively in the transaction with the guardian in paying a large portion of the fund to itself in payment of the guardian's personal debt, thus securing a personal benefit to itself and aiding in placing the remainder of such trust funds to the personal credit of such guardian so that same could be, as in fact they were, immediately misapplied by him. Again it is said that "they (Adoue & Lobit) could not, on surrender of the certificate properly endorsed, have refused to pay him the money therein called for, and they would not be required to see that the money so paid was not misappropriated by him." It seems to us that this conclusion overlooks the fact that in the transaction here the payment and the misappropriation were not only contemporaneous but constituted part and parcel of the same act and that the misappropriation was in the act of payment of Compton's debt to the bank.

Here by express representation and by designation in the certificate, the fund in question was made and stamped with the fixed character of part of his ward's estate. In Moore v. Hanscom plaintiff in error was held liable on Compton's bond on the theory and express holding that there had, by the acts in question, been a complete restitution by the guardian and that such money was the money of the ward. This being true and since, as a matter of law, Adoue & Lobit were visited with the notice of the nature and trust character of the fund, it follows that to the extent necessary to reimburse the bonding company it is entitled to be subrogated to all the rights of the cestui que trust, and all the facts appearing in the record it results that the judgments of the District Court and of the Court of Civil Appeals should be and the same are hereby reversed and judgment is now and here rendered in favor of the plaintiff in error, The United States Fidelity & Guaranty Company, against the defendant in error, Adoue & Lobit, for the sum of $14,361.60 (that being a sum sufficient to indemnify plaintiff in error for the amount paid out by it as surety aforesaid), with interest from March 14, 1908, together with all costs incurred in this and the other courts.

*Reversed and rendered.*

Filed May 24, 1911.

ON MOTION FOR REHEARING.

In the motion for rehearing filed in this case the correctness of the judgment rendered by us is vigorously assailed for all the reasons urged on original submission.

1. The principal question of liability, on the ground that the funds for which defendants in error were held, were trust funds and that they were visited as a matter of law with notice thereof and with such notice appropriated part of the fund to the payment of their personal debt, and as to the remaining $5,000, permitted and assisted in a diversion of same, is thoroughly discussed in the original opinion, and it seems unnecessary to go into that matter again, even if time permitted. However this much may be said. In the case of Moore v. Hanscom, 101 Texas, 293, 106 S. W., 876, it was held by this court that the effect of the transactions herein involved was to constitute the fund evidenced by the certificate of deposit the money of the ward's estate and on this conclusion judgment was in that case rendered against the plaintiff in error here for the full amount thereof. That judgment, even if we doubted its correctness, should in a suit involving the same fund be held to be conclusive and binding upon us in this case. However, we do not doubt its correctness, but rather it seems to us to be clearly right. That defendant in error was visited as a matter of law with notice of the trust character and nature of the fund we have no sort of doubt. That we think is demonstrated by the authorities cited and reasons given in the original opinion and we do not care to go into that question further than to refer to and incorporate herein the following quotation from the opinion of this court in the well considered case of Interstate National Bank v. Claxton, 97 Texas, 569, 65 L. R. A., 820, 104 Am. St., 885, where Justice Williams, speaking for the court, says:

"The principles governing are clearly stated in the opinion of the chief justice in the case of Coleman v. Bank, 94 Texas, 607, 608, 86 Am. St., 871, with copious citations from leading authorities. From these authorities it is clear that a depositor, although holding money in a fiduciary capacity, may draw it out of the bank ad libitum. The bank is bound to honor the checks and incurs no liability in so doing as long as it does not participate in any misapplication of funds or breach of trust. The mere payment of the money to, or upon the checks of, the depositor does not constitute a participation in an actual or intended misappropriation by the fiduciary, although his conduct or course of dealing may bring to the notice of the bank circumstances which would enable it to know that he is violating his trust. Such circumstances do not impose upon the bank the duty or give it the right to institute an inquiry into the conduct of its customer in order to protect those for whom it may hold the fund, but between whom and the bank there is no privity. This is clearly brought out in the leading case of Gray v. Johnson, L. R., 3 Eng. & Ir. App. Cas., 1, in which an executrix by a check signed by her, as such, in favor of a mercantile firm of which she was a member, drew out of a bank a fund belonging to the estate. In the opinion of Lord Chancellor Cairns the law is thus stated: 'On the one hand, it would be a most

serious matter if bankers were to be allowed, on light and trifling grounds—on grounds of mere suspicion or curiosity—to refuse to honor a cheque drawn by their customer, even although that customer might happen to be an administrator or an executor. On the other hand, it would be equally of serious moment if bankers were to be allowed to shelter themselves under that title, and to say that they were at liberty to become parties or privies to a breach of trust committed with regard to trust property, and, looking to their position as bankers merely, to insist that they were entitled to pay away money which constituted a part of trust property at a time they knew it was going to be misapplied, and for the purpose of its being so misapplied. I think, fortunately, your lorships will find that the law on that point is clearly laid down, and may be derived without any hesitation from the authorities which have been cited in the argument at your lordships' bar, and I apprehend that you will agree with me when I say that the result of those authorities is clearly this: in order to hold a banker justified in refusing to pay a demand of his customer, the customer being an executor and drawing a cheque as an executor, there must, in the first place, be some misapplication, some breach of trust, intended by the executor, and there must in the second place, as was said by Sir John Leach in the well known case of Keane v. Roberts, (1) be proof that the bankers are privy to the intent to make this misapplication of the trust funds. And to that I think I may safety add, that if it be shown that any personal benefit to the bankers themselves is designed or stipulated for, that circumstance, above all others, will most readily establish the fact that the bankers are in privity with the breach of trust which is about to be committed.' In the only other opinion, by Lord Westbury, this statement of principle occurs: 'The relation between banker and customer is somewhat peculiar, and it is most important that the rules which regulate it should be well known and carefully observed. A banker is bound to honor an order of his customer with respect to the money belonging to that customer which is in the hands of the banker; and it is impossible for the banker to set up a jus tertii against the order of the customer, or to refuse to honor his draft on any other ground than some sufficient one resulting from an act of the customer himself. Supposing, therefore, that the banker becomes incidentally aware that the customer, being in a fiduciary or a representative capacity, meditates a breach of trust and draws a cheque for that purpose, the banker, not being interested in the transaction, has no right to refuse the payment of the cheque, for if he did so he would be making himself a party to an inquiry as between his customer and third persons. He would be setting up a supposed jus tertii as a reason why he should not perform his own distinct obligation to his customer. But then it has been very well settled that if an executor or a trustee who is indebted to a banker, or to another person having the legal custody of the assets of a trust estate, applies a portion of them in the payment of his own debt to the individual having that custody, the individual receiving the debt has at once not only abundant proof of the breach of trust, but participates in it for his own personal benefit.' The law is stated to the same

effect in Morse on Banks and Banking, and he cites many cases the opinions in which sustain him.   Secs. 317 and cases cited."

2.   But it is urged that in any event as to the $5,000 paid out to Compton's brother, which had been by Adoue & Lobit transferred to Compton's personal credit and account, no recovery should be had.

We think it might be held that in view of the defendants' appropriation of the larger part of the trust fund to payment of their personal debt that this vice should give color and character to their treatment of the whole fund.   However this may be, it is well settled in the authorities and is in accordance with sound legal reason, that when, with knowledge of the trust character of the funds, the bank permits a diversion thereof and aids in the appropriation of same to the trustee's personal debt, that it is and of right should be held liable.   This is clearly held in Ducket v. National Mechanics' Bank, 86 Md., 400, 39 L. R. A., 84, 63 Am. St., 513, where the court say: "And if loss ensued by reason of Clagett drawing the fund out by checks on his personal account the bank is liable."   And again in that case the court say: "Its act in placing distinctly marked trust funds to the *personal* credit of Clagett was *obviously* wrongful and it must bear the resulting consequences."

3.   Again we are urged to set aside the judgment in so far as judgment is here rendered against defendants in error and remand the case for further proceedings.   It would be utterly illogical to do so. If we are correct in our view of the law, under the facts taken most favorable to defendants in error, they are liable.   Let the motion be overruled.

Filed June 23, 1911.