## LONG v. CITY NAT. BANK OF COMMERCE. (No. 2179.)*

(Court of Civil Appeals of Texas. Amarillo. Nov. 7, 1923. Rehearing Denied Dec. 12, 1923.)

1. **Bills and notes ⬄522—Evidence held to show trustees authorized to use notes as collateral.**

In an action by holder on notes made to trustees handling building for a syndicate, evidence *held* to warrant finding that, pending securing of a loan, and in the event one was never secured, the trustees were authorized to use the notes for the purpose of protecting the interest of the maker and other subscribers to the enterprise, and to pledge such notes as collateral.

2. **Appeal and error ⬄219(2)—Without request therefor one cannot complain of failure to make specific finding.**

Where appellant made no request for specific findings, he is in no position to complain of court's failure to find specifically on a certain issue.

3. **Bills and notes ⬄342—Word "trustee" in connection with name of payee gives notice of trust.**

The use of the word "trustee" in connection with the name of the payee of a note gives notice of the existence of a trust.

4. **Bills and notes ⬄342—Word "trustee" in connection with name of payee gives no notice of defenses that maker may have.**

Use of the word "trustee" in connection with the name of the payee of a note does not give a purchaser constructive notice of any defenses of want of consideration which the maker might have urged against the original payee; this conclusion being reached without reference to Negotiable Instruments Law, § 60 (Complete Tex. St. 1920, art. 6001a60).

5. **Bills and notes ⬄330—Indorsement by only one of several trustees, made payees, did not put purchaser on inquiry as to defenses.**

The fact that notes were payable to three persons as trustees, and that indorsement was only made by one of them, did not put purchaser on inquiry as to any defenses that the maker might have to the note, in view of Negotiable Instruments Law, § 41 (Complete Tex. St. 1920, art. 6001a41).

Hall, C. J., dissenting.

On Motion for Rehearing and for Additional Findings.

6. **Trial ⬄368—Parties bound by agreed facts.**

It is too late, on motion for rehearing and for additional findings, to call in question an agreement as to facts on which the case was tried, for the purpose of making a finding as to whether it appears from the other evidence that the agreement does not state the truth.

Appeal from District Court, Wichita County; H. R. Wilson, Judge.

⬄For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Writ of error granted January 30, 1924.

Action by the City National Bank of Commerce against Joe Long, Jr. Judgment for plaintiff, and defendant appeals. Affirmed.

Kay, Akin & Kenley, of Wichita Falls, for appellant.

Bullington, Boone, Humphrey & Hoffman, of Wichita Falls, for appellee.

BOYCE, J. A majority of the court have concluded that appellee's motion for rehearing should be granted and that our former judgment, entered on original hearing, should be set aside and the judgment of the trial court affirmed. Accordingly the original opinion, written by Chief Justice HALL, is withdrawn, and the cause will be disposed of in accordance with the opinions this day handed down.

The City National Bank of Commerce of Wichita Falls brought this suit on two notes for $6,250 each, executed by appellant, Long, payable to "McCoy, Bonner & Nixon, trustees," and by them indorsed and delivered to the plaintiff. These notes were executed by Long in evidence of the balance of his subscription for a $25,000 interest in an association to be organized for the purpose of purchasing a one-half interest in an eleven-story building, known as the Commerce Building, in the city of Wichita Falls. Long defended on the grounds: (1) That the notes were without consideration; (2) that the notes were executed and delivered to be held in escrow pending the consummation of the organization of the association or corporation referred to in the subscription contract, and were wrongfully taken out of escrow and delivered to plaintiff; (3) that plaintiff was not a bona fide purchaser of said notes for value without notice; (4) that the principal note for which plaintiff held these notes sued on as collateral had been paid, and the bank had no further claim on these collateral notes.

Such details of the facts on which these pleas are based as are necessary to be considered in the discussion of the propositions presented will appear in the following statement, and in such further statements as may be made in a detailed discussion of the various propositions.

The subscription agreement referred to is dated April 26, 1920, and is as follows:

"The undersigned, each for himself, hereby subscribes and agrees to pay for the amount of stock or interest set opposite our respective names in a corporation, syndicate, or stock association (as may be hereafter agreed upon) the total capital of which will be $550,000, hereby organized for the purpose of acquiring and owning a one-half interest in and to lot No. 1, block 175, of the city of Wichita Falls, Texas, with the building thereon situated, now known as Commerce Building. One fourth of said amount is paid herewith in cash, and the remainder will be paid in three equal installments, to bear interest at the rate of 6 per cent. per annum and due 3, 6, and 9 months from this date. R. S. Nixon, president of the American National Bank, is hereby authorized to collect all amounts due and to become due hereunder until a permanent organization or plan of operations can be formed."

Long signed this subscription contract for $25,000, and paid $12,500 in cash. The project was being promoted principally by the officers and stockholders of the American National Bank, of which Nixon was president—it being contemplated that said bank would use a part of the building as its banking house; and there is testimony to the effect that it was understood that said bank would take any difference between the amount actually subscribed and the amount necessary to purchase the building. McCoy and Nixon were active in the promotion of the organization. The names of Ray S. Nixon and H. S. Griffin head the subscription list with a subscription of $50,000 each, and their names appear to have been scratched out. Many other names were signed who appear from the list to have paid part cash and given their notes for the balance. It appears that some of the subscribers had not paid anything on their subscription and had not executed any notes. The testimony of the defendant and other subscribers is to the effect that they signed the subscription at the instance of Nixon, relying on the fact of Nixon and Griffin's subscription, and that it had been made in good faith; also relying on representations that a corporation would be formed and a loan secured on the building for one-half the amount for which they were buying it, that the rentals from the building would take care of any further payments, and that the subscribers would thus only have to pay one-half cash and would not be called on for the remainder.

On May 1, 1920, the National Bank of Commerce, the owner of the half interest in the building which the Syndicate proposed to purchase, conveyed such interest to McCoy, Nixon, and Bonner, for the consideration of about $485,000, who paid about $135,000 cash, being out of the money paid by the subscribers to the contract above set out, and gave their notes for the balance, about $350,000. This deed was recorded on May 8, 1920. No trust is recited in this deed or in these notes, though it was understood that such parties were taking title to the property for the benefit of the syndicate subscribers. These subscribers knew that the property had been bought. Long testified that he did not know in whose name the title was taken, but supposed he could have found out if he had inquired. It is in evidence that he discussed the matter of his interest in the building at various times, and expressed a desire to get the association incorporated so that his interest would appear in his own name. The American National Bank moved into the building and occupied a part of it as had

been contemplated, and it is in evidence that Nixon, Bonner, and McCoy, or some one acting for them and for the Syndicate, collected the rents and handled the business incident to the ownership of the building until it was sold at trustee's sale more than a year later. We are inclined to think that all parties interested in this joint enterprise at the time these notes were given and negotiated should be held to be partners. The association, or whatever it was (the parties themselves called it "the syndicate"), did business for more than a year. Nixon, Bonner, and McCoy (by reason of the fact that the title to the property purchased for the Syndicate was taken in their names, the execution of notes for deferred payments in their names, and the delivery of notes for unpaid subscriptions payable to them as trustees) were put forward by, or assumed to act with the apparent approval of the subscribers to the enterprise as their representatives.

On July 15, 1920, Long executed the two notes sued on. They were payable to the order of "McCoy, Bonner and Nixon, trustees," in three and six months after date. He testified that these notes were presented to him for signature by H. M. Frank, cashier of the American National Bank, who represented to him that—

"We are paying some interest on it (evidently on the Nixon, Bonner and McCoy purchase-money notes), and will hold the notes for you in order to put the business in a businesslike shape. These notes will be held in the bank and not transferred to anybody."

Frank, in securing the notes, was acting for the trustees, Nixon, McCoy, and Bonner, and turned the notes into the files of the Syndicate. Frank testified that the signers of the notes knew that he was acting for the trustees and that he told Long and others who signed similar notes:

"That the notes were to be taken to get all the papers completed and for a stock company which Judge Bonner was supposed to be drawing the papers on at that time, and told him the notes were going to be held to clear up the whole affair and get the stock company organized; that we did not expect to use the notes inasmuch as we were figuring on a loan at that time and thought we had a loan placed. * * * I told Joe Long that if we got a loan it would take care of the deferred payments. I told all of them that; I did not tell him what would happen if we did not get the loan. What I told them I told them as Mr. McCoy had instructed me—that we just wanted to get the notes and get the papers complete and form the company. We got the notes so we could get the contract these parties signed evidenced by the notes. We took the notes for the same purpose we took the money."

He testified in another place that he told Long that—

"The notes were to be given just to complete the organization of this company and until the papers could be drawn, and the notes themselves were not to be used except for building up the organization of this stock company. We had no intention of putting the notes in the bank; I mean by putting them in the bank, trading them to the bank."

Another signer of a similar note testified that Frank told him on presentation of the note for signature, that—

"The notes were going to be held until the loan was negotiated, and the notes were going to be held contingent on the negotiations of the loan. That was the way they told me—if the loan was negotiated they would return the notes to us. I never thought of what would be done if the loan was not negotiated."

The National Bank of Commerce was consolidated with the City National Bank of Commerce, and the plaintiff thus acquired the notes of McCoy, Bonner, and Nixon. In order to secure "an extension of time and forbearance from suit" on such notes of McCoy, Nixon, and Bonner, Nixon, with the consent of the other two trustees, delivered the notes of Long sued on herein, to the plaintiff bank, to be held as collateral to the said notes of McCoy, Nixon, and Bonner, signing the indorsement of the notes thus: "McCoy, Bonner & Nixon, Trustees, by R. S. Nixon." It was agreed that the plaintiff so acquired said notes before their maturity and that it—

"had no notice of any infirmity in the instruments or defects of title of the persons negotiating the same, unless the instruments themselves gave notice of said infirmity."

Early in 1921, McCoy, Bonner, and Nixon secured a charter for a corporation named the American Investment Company, organized for the purpose of taking title to said building, with a capital stock of $550,000, on affidavit that the entire amount of said stock had been subscribed by such persons and $275,000 paid in. This payment, according to the affidavit, being the value of the equity of said parties in said property. Certificates of stock were issued to Long and other subscribers, but were not delivered. A meeting of the stockholders was held, at which Long was present, and he was elected a director. He testified that he was not aware of the financial situation of the Syndicate at this time, and did not know of the fraud which he alleged was practiced upon him in the securing of his signature to the subscription and execution of said notes. McCoy, Bonner, and Nixon conveyed the property to said corporation in consideration of its assumption of the balance due on their said notes. This deed was not filed for record.

"Times were good" in Wichita Falls when this project was started; later in the year they were not so good. A number of the signers of the subscription contract, including Nixon, became insolvent. The American National Bank "went out of business," and the negotiations for a loan on the building,

to take care of the balance due on the notes executed by Bonner, Nixon and McCoy, were fruitless, and the plaintiff filed this suit on Long's notes in June, 1921.

On October 4, 1921, the plaintiff purchased at trustee's sale the one-half interest in the building conveyed to McCoy, Nixon, and Bonner; the sale being made under the terms of deed of trust executed by said parties at the time of the purchase, and the bank bid at this sale the sum of $25,000. In August prior to the sale in October, the plaintiff bank had entered into a bond for the sale of said one-half interest in said building, for the sum of $277,000.

A trial without a jury resulted in judgment for the plaintiff on the notes. The court, in its finding, sets out the execution of the various instruments referred to in the foregoing statement, and finds that Long executed and delivered said notes "to W. M. Frank, for the use and benefit of the said Nixon, Bonner, and McCoy, trustees, as the balance of the amount subscribed by Jos. Long, Jr.;" and further that the bank had "no notice of any defect or infirmity of title" to the notes at the time it acquired them. No specific finding is made as to whether any fraud had been practiced in the matter of securing plaintiff's subscription or as to the condition under which said notes were executed and delivered, except as they are covered by the general findings above quoted, and no specific finding was made as to the authority of the said Bonner, Nixon and McCoy to put the notes up as collateral to their own notes.

[1] The first contention urged by the appellant is that the notes were placed in escrow in the American National Bank, "pending the consummation of the proposed contract, which was never consummated," and were wrongfully withdrawn from the escrow by the trustees. We do not think the evidence conclusively establishes the facts as thus contended by appellant. The evidence, a part of which we have set out in the foregoing statement, warranted the trial court, we think, in the finding that, pending the securing of a loan and in the event one was never secured, the trustees were authorized to use these notes for the purpose of protecting the interest of the subscribers to the enterprise, and that this was the purpose of the pledge of these notes as collateral to the plaintiff bank.

The next proposition presented is that the bank had sold the property, securing the Nixon, Bonner, and McCoy notes for more than sufficient to pay off said notes, and thereby discharged the collateral. Again, we think the facts do not sustain the contention. If the contract for sale at $277,000 should be executed and should be taken as the measure of the amount realized for said property, instead of the sum for which plaintiff later

256 S.W.—64

bought it at trustee's sale, yet there would still be due a balance on the Nixon, Bonner, and McCoy notes amounting to more than the amount due on the notes executed by appellant in suit.

[2] The next proposition urged as the first proposition under the fourth assignment, is that the word "trustee" following the name of the payees in the notes, is sufficient to put plaintiff bank upon inquiry as to the defenses against them, so as to prevent the bank from being protected as a bona fide purchaser. This proposition is made a predicate for the further proposition urged as the first proposition under the sixth assignment and as the first proposition under the tenth assignment, that appellant "had a defense to the notes in that they were without consideration." Appellant's position under the latter claim is that he was not bound by his subscription contract because of the fact that Nixon, Griffin, and McCoy, who were the largest stockholders in the bank and the principal promoters of the proposed enterprise, and the bank itself, were in a failing condition and insolvent at the time of the circulation of the subscription list and that such persons knew that the proposal for the purchase of the property could not be consummated; that plaintiff subscribed on the solicitation of Nixon and on representation that he and Griffin had each subscribed $50,000 and would pay their subscriptions; that said subscriptions were not made in good faith; that Nixon and Griffin's names were subsequently erased from the subscription list and they paid nothing thereon; that these facts constituted a fraud and rendered the subscription contract void, so that there was no consideration for the notes. It does not appear that Nixon, Griffin, or the American National Bank were insolvent at the time the subscription contract was signed. It does appear that in the fall of the year 1920 Nixon and several of the other subscribers were insolvent and the bank in a failing condition. It does not appear when Griffin's and Nixon's names were erased from the subscription list, nor does it appear who made the erasures and by what authority. Nixon denies that he authorized the erasure of his name. The witness Frank testified that he discussed these subscriptions with Nixon at the time of the organization of the National Bank of Commerce, which was some time after the execution of appellant's notes, and at this time Nixon said "We are not figuring on taking our subscriptions." Nixon testified that the American National Bank assumed the obligation of his and Griffin's subscriptions and paid them. There is testimony that this bank paid about $123,000 into the enterprise. The court made no finding as to this matter, and no request was made by the appellant for specific findings, so that he is not in position to complain of the court's failure to find spe-

cifically on the issue of consideration. It appears quite probable that the judgment of the court was based on the theory that even if the notes as between the parties were without consideration, because of fraud in connection with the subscription contract as stated, this would constitute no defense to them as against the plaintiff, a bona fide holder thereof; and we may dispose of the case on the same theory. The question of law thus presented involves an inquiry as to the effect the naming of the payees as trustees would have as constructive notice of defenses to the note, and this presents the principal issue of law in the case.

[3, 4] Some authorities hold that the use of the word "trustee" in connection with the name of the payee of a note is to be regarded as descriptio personæ and may be rejected as surplusage. The weight of authority, however, we (the writer speaking for himself and the Chief Justice in this statement) think is that the use of such word gives notice of the existence of a trust. Shaw v. Spencer, 100 Mass. 382, 97 Am. Dec. 107, 1 Am. Rep. 115; Hazeltine v. Keenan, 54 W. Va. 600, 46 S. E. 609, 102 Am. St. Rep. 954, 955; Bank v. Looncy, 99 Tenn. 278, 42 S. W. 149, 38 L. R. A. 837, 63 Am. St. Rep. 830; Hill v. Fleming, 128 Ky. 201, 107 S. W. 764, 16 Ann. Cas. 841; Daniel on Negotiable Instruments (6th Ed.) § 271; 8 C. J. 515. The Supreme Court of this state, we. think, in the case of U. S. Fidelity & Guaranty Co. v. Adoue & Lobit, 104 Tex. 379, 137 S. W. 648, 138 S. W. 383, 37 L. R. A. (N. S.) 409, Ann. Cas. 1914B, 667, gave its adherence to the general rule stated above. This court followed this rule in the case of Fidelity Trust Co. v. Fowler (Tex. Civ. App.) 217 S. W. 953.

We then become concerned with the further question as to the extent of the notice thus given—whether it is notice of any and all defenses that the maker of the note might have to it, thus rendering the note practically non-negotiable, or merely notice involving an inquiry into the power of the trustee to transfer the note. Mr. Daniel, in his work on Negotiable Instruments (6th Ed.) § 271, announces his conclusion as to the authorities as follows:

"The better opinion seems to be that while the fiduciary indicated as payee may transfer a good title, provided he makes the transfer within the authority of and for the benefit of his trust, yet that such words as 'trustee,' etc., suffixed to a payee's name, put his indorsee upon inquiry as to the title, and if the transfer be in fraud of the trust the indorsee must suffer the consequences."

The Supreme Court of Tennessee, in the case of Bank v. Looney, 99 Tenn. 278, 42 S. W. 149, 38 L. R. A. 837, 63 Am. St. Rep. 830, where a maker of a note, given in payment of the amount of a subscription made by him to an enterprise organized to purchase certain property, the note being payable to S. P. Sykes, trustee, was pleading as a defense to the note in the hands of third persons, that his subscription had been procured by fraud, said:

"The rule is that he who takes a security from a trustee, with his fiduciary character displayed upon its. face, is bound to inquire as to his right to dispose of it, but if, on inquiry, it is found that there is no restriction upon the trustee's power of disposition, or (it may be added) there is nothing in the nature of the transaction to indicate any abuse of his trust then the title of a purchaser in good faith, for value and before maturity, will be protected."

The Supreme Court of New York, in the case of Weeks v. Fox, 3 Thomp. & C. 356, says:

"The notice arising from the signature, 'L. Fox, Agent,' imposed no further obligation on him [the purchaser] than that of inquiring whether Lewis Fox had authority to bind the defendant by signing bills in that way; and. in the absence of evidence, the legal presumption is that he did make the inquiry, and that he ascertained what the actual authority was, namely, a general authority to sign bills. He was under no obligation to make further inquiries and ascertain what was the consideration of the bill, or for what purpose it was made. When an agent acts, in making negotiable instruments, within the terms of the authority with which he has been clothed, the fact that he has abused or perverted his authority in the particular instance constitutes no defense as against a bona fide holder. The apparent authority is the real authority."

To the same effect see the following authorities: Fox v. Citizens' Bank & Trust Co. (Tenn. Ch. App.) 37 S. W. 1102, 35 L. R. A. 678, and note: note, 1 L. R. A. (N. S.) 188; Central State Bank v. Spurlin, 111 Iowa, 187, 82 N. W. 493, 49 L. R. A. 661, 82 Am. St. Rep. 511, and particularly notes on pages 514 to 516; Perry on Trusts (6th Ed.) par. 225, and note, pp. 377, 378. It is true that in some of the cases it is said that the use of the word "trustee" and like terms, in connection with the name of the payee, destroys the negotiability of the note. A reference to these cases will be found in the notes above cited. But, as pointed out by the writers of those notes, such expressions are found in cases dealing with controversies between the beneficiaries of the note and the holder rather than in controversies between the maker of the note and the holder. We have found no authority which holds that such fact gives notice of defenses that the maker of the note may have to it, and we are convinced that the weight of authority is to the effect that the negotiability of the note is not destroyed, and that the rule stated by Mr. Daniel and other authorities cited is sound.

This conclusion is reached without reference to the provisions of our Negotiable Instrument Law. Section 60 of that act (Com-

plete Tex. St. 1920, art. 6001a60) reads as follows:

"The maker of a negotiable instrument by making it engages that he will pay it according to its tenor, and admits the existence of the payee and his then capacity to endorse."

One definition of capacity as given by the Century Dictionary, is as follows:

"Ability in a moral or legal sense; legal qualifications; legal power or right."

It may be that the effect of this provision would be to permit the purchaser of the note in due course to assume that the payee who is named in the note as trustee has the authority to negotiate it, unless there be something in the circumstances of the transaction itself to put the purchaser on notice that the payee is violating his trust or acting beyond his authority in negotiating the note. The law certainly does not detract anything from the proposition that the negotiability of the instrument is not destroyed by the use of such terms.

A summary of our conclusion is that the record warranted the trial court in finding that the trustees had the apparent authority to transfer these notes; that they were transferred for the benefit of the trust in pursuance to the general purpose of their execution and the holding by the trustees; and the fact that they were made payable to Nixon, Bonner & McCoy, as trustees, did not give the purchaser constructive notice of any defense of want of consideration which the maker might have urged against the original payees.

[5] Another proposition advanced by appellant is that, since the notes were payable to three persons as trustees, one could not indorse without authority from the others; that as this authority does not appear from the face of the notes themselves, Nixon's indorsement is irregular, and thus deprived the purchaser of any benefit of the rule in favor of a bona fide purchaser. It was shown that Nixon did have authority from the other trustees to indorse the note in their name. No authority is cited that in our opinion sustains appellant's proposition, and we do not think it sound. Section 41, art. 6001a41 R. S.; 8 C. J. 337–339. The inquiry suggested by this form of indorsement would be as to the authority of Nixon to act for the other trustees in signing. No question is raised as to such authority, and this form of indorsement would not, in our opinion, put the purchaser on inquiry as to any defenses that the maker might have to the note.

Motion for rehearing will be granted, and the judgment of the district court affirmed.

RANDOLPH, J. (concurring as to disposition of case). The notes in controversy, upon which the trial court gave judgment in appellee's favor were payable to the order of McCoy, Bonner, and Nixon, "trustees." The trial court found that they were transferred to appellee for a valuable consideration and without notice of any defect in the absolute ownership of McCoy, Bonner, and Nixon.

The writer cannot agree that the term "trustees," without any notice, actual or constructive, except the presence of this term appended to the names of the payees, of itself, gives notice of secret equities or undisclosed interest of a third person. There is no beneficiary designated or purpose of trust indicated, and such term, in my opinion, standing alone, is to be considered surplusage and absolute title passes to the purchaser by the conveyance of such payees in such notes. But especially is this applicable to deeds conveying real estate. Unless there is a named beneficiary and an indicated purpose of trust, a deed to a named party, trustee, conveys an absolute title if it contains words of conveyance, and the purchaser has acted in good faith, paid a valuable consideration, and is without actual knowledge. This, of course, applies only where the records provided for giving constructive notice contain no instrument giving such notice.

Article 1106, Revised Civil Statutes of Texas, is as follows:

"Every estate in lands which shall hereafter be granted, conveyed or devised to one, although other words heretofore necessary at common law to transfer an estate in fee simple be not added, shall be deemed a fee simple, if a less estate be not limited by express words or do not appear to have been granted, conveyed or devised by construction or operation of law."

To my mind there are no such express words limiting the estate to less than a fee-simple estate contained in this expression or term "trustees". This would, undoubtedly, be true, where the instrument is a deed and contains habendum and granting clause.

"A deed to 'L. R., etc., Trustees of the Methodist Society, and to their heirs and assigns forever,' was held to convey an absolute title to L. R., etc., named as grantees; and the words 'trustees of the Methodist Society' were considered descriptio personæ." 1 Devl. on Real Estate, § 191.

In the case of Gabert v. Olcott, 86 Tex. 121, 23 S. W. 986, and Blanc v. Alsbury, 63 Tex. 490, 51 Am. Rep. 666, the conveyances were to the parties as bishop, for the benefit of the Roman Catholic Church. It was held that, notwithstanding the disclosed trust, that the grantee had the full power of alienation.

It is also stated in 13 Cyc. § 625, that the word "trustee" also may be regarded as mere surplusage, except as descriptio personæ.

In the case of Boyer v. Sims, 61 Kan. 593, 60 Pac. 309, where a deed was made to Wm. Sims and T. J. Kellum trustees, the Su-

preme Court of Kansas held that the granting and habendum clauses of the instrument vested in the grantees full power of alienation.

In the case of Crawford v. El Paso Land Improvement Co. (Tex. Civ. App.) 201 S. W. 237, where land was deeded to Crawford, trustee, and to "his successors and assigns," the El Paso Court of Civil Appeals held that Crawford took a fee-simple title for an undisclosed beneficiary, and was vested with power of sale under the very terms of the deed to him.

The case of Studebaker Bros. Mfg. Co. v. Hunt (Tex. Civ. App.) 38 S. W. 1134, is not authority for sustaining the contrary upon the questions here discussed for this reason : In that case Hunt claimed the beneficial title to the land, the legal title to which had been vested in his father. The father had taken the conveyances to himself as trustee. Studebaker Bros. Company levied upon the land and sold it, buying it in at public sale. The company then brought suit against Hunt, the son, to recover the land. The Studebaker Company was not an innocent purchaser for value and without notice of Hunt's title. As a purchaser under the judgment sale, they did not pay value for they surrendered no right by their credit upon the judgment. The ruling of the court in the last-named case that the deed to Hunt, Sr., being a deed to him as "trustee," gave notice of a trust, was based upon the fact that Studebaker Company, was not an innocent purchaser for value, as well as upon the holding that the word "trustee" gave notice. The Supreme Court, in passing upon an application for writ of error, which attacks a judgment of a Court of Civil Appeals, in my opinion will apply the rule: That where the judgment can legally be supported upon any other phase of the case other than the one assigned as error, such judgment will be affirmed, notwithstanding such error, and such judgment will be sustained. Studebaker Bros. Company not being a purchaser for value, the action of the Supreme Court in denying a writ of error could have been based upon the fact that Studebaker Company was not an innocent purchaser for value, and not upon the holding of the El Paso court in holding that the term "trustee" gave notice to the company. That a creditor who buys at his own execution sale and credits the amount of his bid upon his judgment is not a purchaser for a valuable consideration. See Ayres v. Duprey, 27 Tex. 606, 86 Am. Dec. 657; Delespine v. Campbell, 52 Tex. 4; McKamey v. Thorp, 61 Tex. 648; Barnett v. Vincent, 69 Tex. 685, 7 S. W. 525, 5 Am. St. Rep. 98. That the judgment of the trial court will be sustained, if it appears that no other judgment could have been rendered. See McClellan v. Haley (Tex. Com. App.) 250 S. W. 413, and authorities therein cited.

I think, therefore, that the rule as applied to a deed conveying real estate is that, where it recites that the consideration named in it was paid by the grantee, and such deed contains the habendum clause, and does not contain express words limiting the estate granted, the deed vests title in the grantee, notwithstanding the use of the word "trustee" after his name.

Returning to the consideration of the fact of the insertion of the word "trustee" after the name of a payee in a note, I cannot think that notice of any requirement for inquiry will follow by the use of that term, unless there is in connection with said term some legal status or fiduciary relationship between the parties that will by the very transaction itself charge the purchaser with such duty of inquiry. Judge Ramsey, in the case of U. S. F. & G. Co. v. Adoue, 104 Tex. 379, 137 S. W. 648 (original opinion), and 138 S. W. 383 (opinion on rehearing), 37 L. R. A. (N. S.) 409, Ann. Cas. 1914B, 667, clearly makes the distinction which governs such transactions. Adoue and Lobit were bankers. A. J. Compton, guardian of the estate of Menard James, a lunatic, deposited with the bank the sum of $11,913.83, which constituted all of the cash assets of the said estate, and said bank executed and delivered a certificate of deposit in that amount in favor of A. J. Compton, guardian, and payable to his order. Subsequently Compton indorsed such certificate of deposit over to the said bankers, and they appropriated same in payment of Compton's personal debts with them. The Supreme Court held that the principal question in the case was, were Adoue and Lobit charged with notice of the trust character of the funds in question, and were their acts and conduct in relation to same such as to render them liable? and answered same in the affirmative Judge Ramsey, in his opinion on rehearing, in that case, gives his reasons at length for so holding (104 Tex. 379, 138 S. W. 383, 37 L. R. A. [N. S.] 409, Ann. Cas. 1914B, 667), citing the case of Coleman v. Bank, 94 Tex. 607, 63 S. W. 867, 86 Am. St. Rep. 871, and says:

"From these authorities it is clear that a depositor, although holding money in a fiduciary capacity, may draw it out of the bank ad libitum. The bank is bound to honor the checks and incurs no liability in so doing, as long as it does not participate in any misapplication of funds or breach of trust. The mere payment of the money to, or upon the checks of, the depositor does not constitute a participation in an actual or intended misappropriation by the fiduciary, although his conduct or course of dealing may bring to the notice of the bank circumstances which would enable it to know that he is violating his trust. Such circumstances do not impose upon the bank the duty or give it the right to institute an inquiry into the conduct of its customer in order to protect those for whom it may hold the fund, but between whom and the bank there is no privity.

This is clearly brought out in the leading case of Gray v. Johnson, L. R. 3 Eng. & Ir. App. Cas. 1, in which an executrix, by a check signed by her, as such, in favor of a mercantile firm of which she was a member, drew out of a bank a fund belonging to the estate. In the opinion of Lord Chancellor Cairns the law is thus stated: 'On the one hand, it would be a most serious matter if bankers were to be allowed, on light and trivial grounds—on grounds of mere suspicion or curiosity—to refuse to honor a check drawn by their customer, even although that customer might happen to be an administrator or an executor. On the other hand, it would be equally of serious moment if bankers were to be allowed to shelter themselves under that title, and to say that they were at liberty to become parties or privies to a breach of trust committed with regard to trust property, and, looking to their position as bankers merely, to insist that they were entitled to pay away money which constituted a part of trust property at a time when they knew it was going to be misapplied, and for the purpose of its being so misapplied. I think, fortunately, your lordships will find that the law on that point is clearly laid down, and may be derived without any hesitation from the authorities which have been cited in the argument at your lordships' bar, and I apprehend that you will agree with me when I say that the result of those authorities is clearly this: In order to hold a banker justified in refusing to pay a demand of his customer, the customer being an executor and drawing a check as an executor, there must, in the first place, be some misapplication, some breach of trust, intended by the executor, and there must in the second place, as was said by Sir John Leach in the well-known case of Keane v. Roberts, be proof that the bankers are privy to the intent to make this misapplication of the trust funds. *And to that I think I may safely add that, if it be shown that any personal benefit to the bankers themselves is designed or stipulated for; that circumstance, above all others, will most readily establish the fact that the bankers are in privity with the breach of trust which is about to be committed.'" (Emphasis mine.)

Quoting further from the opinion on rehearing:

"Supposing, therefore, that the banker becomes incidentally aware that the customer, being in a fiduciary or a representative capacity, meditates a breach of trust and draws a check for that purpose, the banker, not being interested in the transaction, has no right to refuse the payment of the check, for if he did so he would be making himself a party to an inquiry as between his customer and third persons. He would be setting up a supposed jus tertii as a reason why he should not perform his own distinct obligation to his customer but then it has been very well settled that, if an executor or a trustee who is indebted to a banker, or to another person having the legal custody of the assets of a trust estate, applies a portion of them in the payment of his own debt to the individual having that custody, the individual receiving the debt has at once not only abundant proof of the breach of trust, but participates in it for his own personal benefit."

This case does not attempt to pass upon the effect to be given the word "trustee" by the court, in passing upon a case in which parties are charged with notice by the law because the law charged them with knowledge of its requirements in all transactions between guardians and wards and this because of their applying the proceeds to their personal debts.

In each of the cases (Hurst v. Marshall, 75 Tex. 452, 13 S. W. 33, and Bank v. McIntire (Tex. Civ. App.) 142 S. W. 613) the seller in the first case and the purchaser in the other, had actual knowledge of all the facts, in addition to being charged by law with knowledge that the money was the money of an estate and not the money of a guardian, and in each case received personal benefits by personal appropriation of the funds.

In this case the appellee, being a purchaser in good faith for value and without notice, I am of the opinion it should have recovered, and upon this question the case should be affirmed.

I am also of the opinion that the defenses of Long could not be presented in this action. It was never intended to stretch the rule to the extremity of holding that notice of the defenses of the maker was given; hence I concur in that part of Associate Justice Boyce's opinion holding that the fact that the notes were made payable to McCoy Nixon, and Bonner did not give the purchaser constructive notice of any defenses of want of consideration which the maker had against the original payee.

HALL, C. J. (dissenting). I find myself unable to agree with either of my Associates in the disposition made of this appeal, and I cannot assent to all of the legal conclusions announced in both opinions, and I also think that the facts and the findings of the court require this court to reverse and render the judgment in favor of the appellant, Long. I cannot assent to the pronouncement of Judge RANDOLPH that the word "trustees" in the notes, in connection with the names of the payees, is to be considered descriptio personæ, and should be considered surplusage. Missouri seems to be the only jurisdiction which has adopted such an extreme view, and it appears that the courts of that state so hold because of the language of section 842, R. S. 1919, and it appears from the case of Farmers' & Merchants' Bank v. Siemers, 210 Mo. App. 247, 242 S. W. 417, that the St. Louis Court of Appeals readily seizes upon doubtful language in a note as grounds for holding contrary to the rule as announced in former decisions. I am also unable to agree with Judge RANDOLPH that the rule, as so broadly stated by him, is applied even in transfers of real estate in Texas. In the

case of Crawford v. El Paso Land Improvement Co. (Tex. Civ. App.) 201 S. W. 237, Judge Higgins recognizes the rule to be as follows:

"Trustees may not sell the trust estate without express or implied authority conferred upon them by the trust instrument;"

and holds that the trustee, as grantee in the deed under consideration, had such authority because the habendum clause recites that "Crawford, trustee," his successors or assigns," and grants other powers to the "trustee or his assigns" carries with it the implied power to assign. In Olcott v. Gabert, 86 Tex. 121, 23 S. W. 985, the Supreme Court held that the use of the word "assigns" in the deed then being construed impliedly authorized the trustee to sell. The case of Studebaker v. Hunt (Tex. Civ. App.) 38 S. W. 1134, without any discussion of the several clauses of the deed, holds that a deed to a grantee as trustee, without naming any beneficiary, is constructive notice to a purchaser under attachment proceedings against the grantee. A writ of error was refused. These cases may be reconciled upon the ground that, if the grant is made to a trustee "and his assigns" there is a clear implication that he has the power to sell. This nevertheless, in no way changes the well-settled rule as announced by Judge Higgins in the Crawford Case. If United States Fidelity & Guaranty Co. v. Adoue & Lobit, 104 Tex. 379, 137 S. W. 648, 138 S. W. 383, 37 L. R. A. (N. S.) 409, Ann. Cas. 1914B, 667, holds anything, it is that a certificate of deposit, payable to a person in a fiduciary capacity, is notice that it is trust property; and further, that it puts any one receiving it upon inquiry. Beyond this that case is no authority in the instant case. Whatever may be the rule in Kansas or other jurisdictions, Hurst v. Marshall, 75 Tex. 452, 13 S. W. 33 and Bank v. McIntire (Tex. Civ. App.) 142 S. W. 613, clearly and pointedly announce the same rule. I am convinced that the great weight of authority, aside from the provisions of the Negotiable Instruments Law, is to the effect that the words "trustees," "guardian," "administrator," etc. following the name of the payee, in a negotiable instrument, do not destroy its negotiability. And I am also thoroughly convinced that, according to the weight of authority, such words, in connection with the named payee, cannot be considered surplusage. As stated by Judge Boyce:

"The weight of authority, however, we * * * think is that the use of such word [trustee] gives notice of the existence of a trust."

This writer has expressed his views upon this point in the case of Fidelity Trust Co. v. Fowler (Tex. Civ. App.) 217 S. W. 953 and deems it unnecessary to add anything further to what was there said; however, numerous additional authorities might be cited sustaining the rule there announced. In my opinion, under the law merchant, the word "trustees" is not notice "of any and all defenses that the maker of the note might have to it, thus rendering the note practically nonnegotiable," but, as said in each of the authorities cited by Judge Boyce, the indorsee is put upon inquiry as to the title of the trustees and his authority to indorse and transfer it. This writer inclines to the opinion that the Negotiable Instruments Law changes the rule of the law merchant to some extent in favor of the maker in reference to the question under consideration. Section 52 of the Negotiable Instruments Law (Acts 36th Legislature [1919] p. 196, c. 123; Vernon's Ann. Civ. St. Supp. 1922, art. 6001—52) provides:

"A holder in due course is a holder who has taken the instrument under the following conditions: * * * 3. That he took it in good faith and for value; 4. that at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it."

Section 55, Id., is as follows:

"The title of a person who negotiates an instrument is defective within the meaning of this act when he obtained the instrument, or any signature thereto, by fraud, duress, or force and fear, or other unlawful means, or for an illegal consideration, or when he negotiates it in breach of faith, or under such circumstances as amount to a fraud."

Section 59, Id., provides:

"Every holder is deemed prima facie to be a holder in due course; but when it is shown that the title of any person who has negotiated the instrument was defective, the burden is on the holder to prove that he or some person under whom he claims acquired the title as holder in due course."

It follows from these provisions that if the appellant, Long, executed the notes in question through the fraudulent representations of the promoters, or if he was induced to execute them by false statement of facts or representations by the promoters as to their future conduct or by reason of their promise not to negotiate his notes, and it further appears from any evidence that there is a breach of faith or any circumstance connected with the transaction which amounts to fraud, either actual or constructive, then the title of the trustee is defective. According to section 59, under such circumstances the burden is upon the appellee bank to prove that it acquired the notes as a holder in due course. According to section 52 the appellee is not a holder in due course if it had notice at the time it acquired the notes of any infirmity in the notes themselves or of any defect in the title of the trustees. A multitude of cases are to be

found in the books bearing upon the effect of the word "trustee" as notice, but one of the clearest presentations of the law which the writer has found, is here quoted from the opinion of Judge Sanborn, in Geyser-Marion G. M. Co. v. Stark, 106 Fed. 558, 45 C. C. A. 467, 53 L. R. A. 684. That was a case in which certain certificates of stock had been issued to "Felix J. Stark, Trustee," and in transferring them he had indorsed them as follows: "Felix J. Stark, Trustee." Judge Sanborn said:

"But the word 'trustee' means something. It is a warning and declaration to every one who reads it (1) that the person so named is not the owner of the property to which it relates; (2) that he holds it for the use and benefit of another; (3) that he has no right or power to sell or dispose of it without the assent of his cestui que trust. It denies the equitable ownership and beneficial interest of the party to whom it is applied, and asserts that he holds it in a representative capacity. It signifies the opposite of the word 'owner,' and means that, while the party called 'trustee' has the naked legal title, he has no beneficial right, title, or interest in the property. No one who should read in stock certificates or in corporate records that one share was owned by Felix J. Stark, while another was owned by Felix J. Stark, trustee, would fail to understand that he held the former for himself, and the latter for another. Not only this, but the term 'trustee' is a term of administration, and not of sale. A trustee ordinarily holds the property intrusted to his charge to collect the rents, issues, dividends, or profits thereof, and to apply them to some specified use. Brokers, administrators, and executors frequently have the power to dispose of the property intrusted to their charge. Trustees commonly have no such power. Hence the legal presumption is that a trustee has no power to sell or convey the property which he holds in his fiduciary capacity, and the fact that he holds it as trustee is a warning and a declaration to all the world that he is without the power of disposition, unless that power is specifically given by the instrument creating the trust, or by the assent of those whom he represents. The legal presumption is that a trustee has no power of sale. Jaudon v. National City Bank, 8 Blatchf. 430, Fed. Cas. No. 7,230; * * * Duncan v. Jaudon, 15 Wall. 165, 175, 21 L. Ed. 142, 145; * * * Allen v. St. Louis Nat. Bank, 120 U. S. 20, 32, 30 L. Ed. 573, 575, 7 Sup. Ct. Rep. 460. * * * It is said, however, that the term 'trustee' gave no indication of the name of the equitable owner, and that this fact relieved the corporation from the discharge of its duty. This corporation was bound to exercise reasonable diligence to ascertain whether or not the equitable owner of this stock had authorized its transfer, and to prevent its cancellation and its loss by him if he had given no such authority. The warning and declaration which the word 'trustee' bore to this corporation that Felix J. Stark was not the owner, that he held it for another, that he had no power to assign it, were certainly sufficient to put the company upon inquiry for the cestui que trust, and for his assent to the surrender and destruction of the certificates. No reasonable man, in the presence of such a warning, and in the honest discharge of such a duty, would fail to investigate; and notice sufficient to put a man of reasonable prudence and intelligence upon inquiry is notice of all the facts which a diligent investigation would develop, or is evidence from which knowledge of those facts may be inferred and found."

If it is the law, even under the law merchant, aside from the provisions of the Negotiable Instruments Law, that the word "trustees," used in connection with the names of the payees, was sufficient to put appellee bank upon inquiry as to the title, and the right of the payees to dispose of the note, the further question arises, Of whom was the bank required to make inquiry? This writer is of the opinion that it was the duty of the appellee bank to make inquiry of Long himself. This point is not discussed in the opinion of either of my Associates, but I think it is the crux of the case. Clearly an inquiry limited to the trustees themselves would not meet the requirements of justice, nor evidence good faith on the part of the bank, for if the trustees had wrongfully determined to dispose of the note they would not hesitate to claim that they had full authority to do so. Ordinary prudence and good faith required the bank to make inquiry of Long himself. This is the effect of the decision of Judge Taft in Jonathan Mills Mfg. Co. v. Whitehurst, 72 Fed. 496, 19 C. C. A. 130, in which he says:

"It is well established that one who has reason to believe that another is offering property for sale, which he holds either as trustee or agent for a third person, cannot become a bona fide purchaser of the property for value by reliance on the statements of the suspected trustee or agent, either as to his authority, or as to his beneficial ownership of the thing sold. In such a case, inquiry must be made of some one other than the agent or trustee—of some one who will have a motive to tell the truth, in the interest of the cestui que trust or principal. Trust Co. v. Boynton, 71 Fed. 797."

The case of Shaw v. Spencer, 100 Mass. 382, 97 Am. Dec. 107, 1 Am. Rep. 115, cited by Judge Boyce, holds that an inquiry should be prosecuted beyond the trustee. To the same effect is Golson v. Fielder, 2 Tex. Civ. App. 400, 21 S. W. 173. See, also, Bogert on Trusts, 519; 2 Perry on Trusts (6th Ed.) § 800, and notes; In re Stanford Clothing Co. (D. C.) 187 Fed. 172; Ward v. City Trust Co., 192 N. Y. 61, 84 N. E. 585; Merchants, etc., Bank v. Ohio Valley Furniture Co., 57 W. Va. 625, 50 S. E. 880, 70 L. R. A. 312.

Section 56 of the Negotiable Instruments Law (Vernon's Ann. Civil Statutes Supp. 1922, art. 6001—56) provides:

"To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is

negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith."

The notes were payable to "McCoy, Bonner & Nixon, Trustees," and were indorsed "McCoy, Bonner & Nixon, Trustees, by R. S. Nixon." Under the same circumstances the Supreme Court of Tennessee held, in Ford v. Brown, 114 Tenn. 467, 88 S. W. 1036, 1 L. R. A. (N. S.) 188, that the indorsement by the payee as trustee presumptively fixed the indorsee with actual knowledge of the want of authority in the indorser to dispose of the paper for his own benefit. To the same effect is the holding in the Missouri case (Farmers' & Merchants' Bank v. Siemers, supra) where numerous cases are cited sustaining the rule. It is said in 8 C. J. 504:

"This provision as to bad faith means that the suspicions or facts putting a prudent person on inquiry are not sufficient to preclude one from being a holder in due course, and merely reiterates the common-law rule as laid down in nearly all of the states. However, thereunder as at common law, a purchaser cannot shut his eyes to the surrounding circumstances."

Id. 505:

"The rules just stated are subject to the important qualifications that, where the circumstances are such as to justify the conclusion that the failure to make inquiry arose from the suspicion that inquiry would disclose a vice or defect in the instrument or transaction, such indorsee is charged with knowledge. The rule is well stated in the leading case in this country as follows: 'Every one must conduct himself honestly in respect to the antecedent parties when he takes negotiable paper, in order to acquire a title which will shield him against prior equities. While he is not obliged to make inquiries, he must not willfully shut his eyes to the means of knowledge which he knows are at hand, * * * for the reason that such conduct whether equivalent to notice or not would be plenary evidence of bad faith.'"

It is said, in Id. 515, 516:

"The expression of a holder or a transferor's fiduciary character upon the face of a negotiable instrument is notice to the purchaser of a probable limited or restricted authority to negotiate the same. This is so where paper is signed or indorsed by an agent as such, especially where the paper is made payable to him as agent, or where it appears on the face of the paper by the indorsement to the holder, * * * that the transferor has the instrument as trustee or guardian or in some other official capacity. If a note is made payable to and indorsed by a certain person with the word 'trustee' added, the use of such word is notice to prospective purchasers of the note requiring them to inquire as to the powers of the payee to dispose of the instrument and the rule is not changed by the provisions of the Negotiable Instruments Law requiring actual knowledge or knowledge amounting to bad faith, to constitute notice, since such an indorsement presumptively fixes the purchaser with actual knowledge of want of authority in the trustee to dispose of the paper for his own benefit."

The notes in question were not only payable to the payees as trustees, but they were indorsed "McCoy, Bonner & Nixon, Trustees, by R. S. Nixon." Under the well-established rule that plural trustees of a private trust must all act jointly and as a unit (Bogert on Trustees, 320) an indorsement by only one of them for his cotrustees is insufficient, even if it appeared from the indorsement that R. S. Nixon was in fact one of the trustees named as payees. When a note which is payable to several payees, not partners, is transferred, all of them must indorse it, otherwise the transfer is insufficient and irregular. Pease v. Dwight, 6 How. 190, 12 L. Ed. 401. For a stronger reason all payees who are fiduciaries with no implied power to transfer should indorse the note. In the instant case there is nothing appearing from the face of the notes themselves to identify R. S. Nixon as one of the trustees and payees; therefore, without extrinsic evidence relating to that matter, the appellee bank has taken notes (1) from one who has apparently no title at all, and (2), putting it most favorably for the bank, from only one of three cotrustees. Moreover the bank has taken the notes made payable to three fiduciaries, who, presumptively, have no title they can convey. From these circumstances I am driven to the conclusion that the bank had actual knowledge of the defects in the title of the transferor R. S. Nixon, and certainly it had knowledge of such facts which amounted to bad faith under Vernon's Ann. Civ. St. Supp. 1922, art. 6001—56, supra, where it appears that no inquiry was made even of the trustees or either of them. See, also, 3 R. C. L. 1082–1088; Id. 1033, §§ 239, 240, and authorities cited; Mansfield v. Wardlow (Tex. Civ. App.) 91 S. W. 859; 1 Perry on Trusts (6th Ed.) §§ 224, 225, and notes, 217, 219, 239; Id. vol. 2, § 800, and note, 828, 834. The position of the bank as a holder in due course is in no degree strengthened by its acquisition of the notes through other banks and consolidation therewith. Farmers' & Merchants' State Bank & Trust Co. v. Cole (Tex. Civ. App.) 220 S. W. 354. From a review of all the cases I have found, I believe, that the word "trustees" in the face of the notes was actual notice to the bank of the defect in their title, and certainly put the appellee upon inquiry as to the power of the trustees to transfer, that the bank should have inquired beyond the trustees, and that its failure to do so constitutes the bank a taker in bad faith. It is true that the trial court found as a fact that the appellee "bank had no notice of any infirmity or defect of title," but this

finding, in view of the uncontradicted facts appearing from the face of the notes and from the further circumstance that they were indorsed by the payees as trustees "by R. S. Nixon" is rather a conclusion of law, and that such finding is subject to review here. Even if it could be held to be a finding of fact, nevertheless, since the court filed his findings and conclusions after the adjournment of the time, under district court rule 101, providing that assignments of error relating to any ruling or action of the trial court which occurs subsequently to the rendition of a final judgment may be incorporated in the brief filed in the Court of Civil Appeals, the appellant is entitled to have such action reviewed by this court. Goodman v. W. S. Peck Co. (Tex. Civ. App.) 192 S. W. 785. It is further held that where there is a statement of facts accompanying the record it is not necessary for the appelant to except to the trial court's findings in order to have them reviewed by the appellate tribunal. Hahl v. Kellogg, 42 Tex. Civ. App. 636, 94 S. W. 389. And where exception is taken to the judgment overruling the motion for new trial it is not necessary for the appellant or plaintiff in error to except specially to the trial judge's findings and conclusions. Hess & Skinner Engineering Co. v. Turney, 109 Tex. 208, 203 S. W. 593; Temple Hill Development Co. v. Lindholm (Tex. Com. App.) 231 S. W. 321. Now suppose appellee had inquired of Long or of Frank, the cashier of the American National Bank, or in fact of any of the subscribers to the enterprise, what facts would it have learned? Frank is the man to whom the promoters assigned the duty of collecting the cash payments due upon the subscription agreement and taking and holding the notes for the deferred amounts. It would have learned that the entire scheme was based upon a subscription agreement, which provided for the organization of a corporation syndicate or stock association to be thereafter agreed upon, with a total capital stock of $550,000, which organization should acquire and own a one-half interest in what is known as the Commerce Building in Wichita Falls. The subscription agreement expressly stipulates:

"One-fourth of said amount is paid herewith in cash and the remainder will be paid in three equal installments due three, six, and nine months from date."

The bank would have further learned that some of the subscriptions were fictitious, viz. that of Griffin and Nixon (37 Cyc. 493); that several subscribers had made no cash payment at all and were wholly insolvent; that many of them had not executed any notes; that the notes of all subscribers were to be held in escrow and by express agreement with the promoters were not to be negotiated by Frank or the American National Bank of which he was cashier; that they were executed upon conditions which had not been performed and could not be; that no such corporation with the amount of capital stock stipulated in the subscription agreement had ever been organized or could be organized; that the notes were to be held in escrow and after enough cash had been collected to pay for one-half of the said interest in the building a loan was to be secured by the promoters to cover the amount represented by the notes of subscribers; and that said notes were to be paid by rents from the building, and the promoters expressly represented to the appellant that rents then accruing were amply sufficient to pay off the loan and interest. The bank would have further learned that the building had been conveyed to McCoy, Bonner, and Nixon as individuals; that Nixon's subscription was fictitious, and that McCoy and Bonner were not even subscribers to the enterprise; that the attempt to organize a corporation with a capital stock of about $375,000 had been a failure; and that no certificates of stock had ever been issued and delivered to any subscriber. The court finds that the American National Bank would pay the difference between the sum of the amounts actually subscribed and the amount necessary to purchase the one-half interest in the building, but it does not appear that the appellant, Long, so understood it, and that such purpose was a secret, one existing only in the minds of Griffin, Nixon, and McCoy. It further appears that said bank and its principal stockholders were insolvent. The appellee would have further ascertained that, after McCoy, Bonner, and Nixon had purchased in their own names the very property which the appellant had agreed to participate in buying, they executed a deed of trust upon the same to secure their individual notes for the purchase price made to the appellant bank, and that all of its transactions was a gross violation of the subscription agreement.

I do not believe the record sustains the conclusion reached by Judge BOYCE that the acquisition of the property and their subsequent disposition of the same was for the benefit of the subscribers. Several of the subscribers besides the appellant and Hines had executed and delivered their notes to the trustees, but none of these notes, except those executed by appellant, Long, and Hines were deposited as collateral to the individual notes executed by McCoy, Bonner, and Nixon, as part payment for the building. In my opinion there is nothing connected with the transaction that tends to show that the relation of partners existed between the subscribers. The subscription list recites that the purpose of the subscription was to organize a corporation or some other similar entity to take over the building. The partnership relation can exist between the parties only by agreement, express or necessarily

implied. There is nothing in the record which to my mind would justify the conclusion that the bank is in a position to insist that a partnership existed at any time. 20 R. C. L. § 12; Gilmore on Partnership, pp. 6, 7; Fink v. Brown (Tex. Com. App.) 215 S. W. 846.

I think the record unquestionably sustains the appellant's contention that he was induced to execute the notes and the subscription contract through fraud and misrepresentation, that there has been a total failure of consideration, and that, because of the fictitious subscription and the fraud of the promoters in obtaining it, he is released from any obligation whatever. Since the subscription contract recites one-fourth of the amount subscribed is paid in cash, and that the remainder will be paid in three equal installments, Long had the right to rely upon such recitals as a condition precedent to his becoming liable thereon. Long testified that when he signed the subscription contract, R. S. Nixon, H. S. Griffin, Sam Krueger, and Harry Jaffre had already signed it, showing that Nixon had subscribed $50,000 and a like sum for Griffin and Krueger; that Nixon told him that they were in sufficient shape to take care of the deal—that his notes would never have to be paid, that the rentals were sufficient to take care of the balance due on subscribers' notes, and that everybody was going to pay in their money in the same way; that Frank, the cashier of the American National Bank, told him that the notes would be held in that bank and never transferred to anybody; that the stock of the American National Bank was owned almost entirely by Nixon and McCoy.

Frank himself testified that he was present when appellant, Long, executed the notes, and that he accepted them; that he had been requested by McCoy and Nixon to get the notes, and that Long signed his notes in the bank at Frank's desk. He further testified that he told all of the subscribers just what he told Long at McCoy's instructions; that is, that the notes were to be taken to get the papers completed for a stock company, for which an attorney was then drawing the necessary papers, and that the notes were going to be held to clear up the affair and to enable them to get the company organized; that they did not expect to use the notes, inasmuch as they were figuring on a loan and thought they had a loan placed at that time. Frank further testified that he told Long that the notes were to be given just to complete the organization of the company and to be held until the papers could be drawn, and that the notes themselves were not to be used except as a basis for the organization of the company, and that the promoters had no intention of trading the notes to the bank. He further testified that he heard Griffin or Nixon say that they had no intention of making good their subscriptions, and that

their agreement to subscribe was not in good faith. It appears that Nixon, Bonner, and McCoy made application for a charter for a company named the "American Investment Company," with a capital stock of $275,-000 paid in; that McCoy had subscribed $200,000, R. S. Nixon $200,000, and Bonner $150,000. There further appears in the record a deed from these parties to the American Investment Company, conveying a half interest in the building, which had never been recorded. I understand the rule to be that the alteration of the terms of a stock subscription contract without the consent of the subscribers is a fraud and releases a subscriber to the organization. Bohn v. Burton-Lingo Co. (Tex. Civ. App.) 175 S. W. 173.

It is said in 2 Fletcher's Cyclopedia, "Corporations," § 615:

"False representations that the capital stock of a proposed corporation is to be a certain sum (citing LeMaster v. Hailey [Tex. Civ. App.] 176 S. W. 818), or that all or a certain amount of the capital stock of a corporation has been subscribed for may constitute actionable fraud, and the same is generally held to be true for false representations that certain named persons have subscribed for stock. Representations that the subscriptions upon a list shown to the subscribers are all bona fide subscriptions when some of them are not, have been held to constitute fraud, as have representations that certain persons have subscribed for a certain amount of stock where there is a secret agreement that they shall not be required to pay for the same. Representations that a certain amount of the capital stock has been actually paid in (citing Commonwealth B. & C. Insurance Co. v. Meeks [Tex. Civ. App.] 187 S. W. 681; Id. v. Cator [Tex. Cr. R.] 175 S. W. 1074; Id. v. Bomar [Tex. Civ. App.] 169 S. W. 1060) or that subscribers who have not yet signed notes for the amount of their subscriptions are ready and willing to do so or to pay the same in cash, have been held to be actionable."

The same author says, in section 524:

"Since there must be mutual assent to constitute a binding contract of subscription, an offer to one person or corporation cannot be accepted by another, and it necessarily follows that a person who subscribes for stock in a corporation to be formed and who does not consent to any change in the subscription, is not liable if the corporation which is afterwards formed and which seeks to enforce a subscription is a different corporation from that contemplated by the subscription. In such a case no contract at all is formed (citing Baker v. Fort Worth Board of Trade, 8 Tex. Civ. App. 560, 28 S. W. 403). The subscriber is entitled to stand upon the contract he has made and cannot be compelled to accept a different one, regardless of whether it is more or less favorable to him."

In Id. section 621, it is said:

"As a general rule, to constitute fraud for the purpose of avoiding a subscription to stock as for the purpose of avoiding any other con-

tract, there must be a false representation and not a mere failure to disclose facts without more. A representation, however, which is true as far as it goes, may be rendered false by reason of a failure, to disclose facts, or in other words, may be half truth only, and in such a case it will amount to fraud (citing Peerless Fire Ins. Co. v. Reveire [Tex. Civ. App.] 188 S. W. 254). This is true where a prospectus or other statement purports to be a full and fair statement of facts but conveys a false impression by reason of the suppression of material facts. This principle applies to oral representations. So one who is induced to subscribe by representations that a certain other person has subscribed may rescind, where the latter's subscription is made under the latter's secret agreement that he will not be required to pay for his shares or will not be required to pay for them in full, and the same has been held to be true where the agent represents that the subscription is to the stock of a corporation to be formed in the future by certain persons known to the subscriber to be men of repute and standing in the community and of good business and financial ability. * * * A disclosure or concealment of material facts will constitute fraud where there is a duty to disclose them. If the subscriber has no other information on the subject than that which the promoter or agent chose to convey, the statements of the latter must be characterized by the utmost fairness and honesty. So concealment by a promoter of the fact that other subscriptions are not bona fide, or that he has agreed to release all subscribers who desire to be released from their subscriptions (citing Hall v. Grayson County National Bank [36 Tex. Civ. App. 317] 81 S. W. 762) may constitute fraud. * * * So it has been held that he may rescind where the promoter falsely represents that he and the subscriber are on an equality with reference to property purchased by the promoter for the corporation."

With reference to the creation and organization of the corporation, it is said, in 14 C. J. 530, § 796:

"Of course, payment of subscriptions to stock need not be made until after the charter has been issued or final certificate of incorporation filed, for until then there is no contract, and there is no legal entity to receive payment. Furthermore, when a subscription is made to the capital stock of a corporation to be subsequently formed, there is often an expressed condition precedent to liability on the subscription that the corporation contemplated by the subscription shall be legally created, and even when not so expressed such a condition is implied, so that, until a de jure corporation is formed, the subscriber is not liable unless he waives defects in the formation of the corporation or so conducts himself as to be estopped to deny its corporate existence; and to render the subscriber liable it is necessary, in the absence of estoppel, that the corporation formed shall be with respect to its character, powers, and otherwise the identical corporation contemplated by the subscription, and that it shall be formed within the time, if any, specified, in the subscription, or within a reasonable time, when no time is specified. * * * Where a corporation as proposed is to have a specified capital, the subscriber is released where the corporation as organized has a different capitalization, unless the change has been waived or the subscriber is estopped to raise the objection. So the subscriber may be released by an organization with less amount of paid-up capital stock than originally contemplated."

The appellee does not plead waiver or estoppel as against the appellant in relation to any matters connected with the organization or attempted organization of the company. Long testified that he personally knew a great many of the subscribers, and would not have signed the subscription contract and notes if he had known that the names of certain subscribers would be erased and that other subscribers did not sign in good faith and did not intend to make their payments and execute notes in accordance with the provisions of the subscription contract. This court held, in Wrather v. Parks (Tex. Civ. App.) 227 S. W. 513, that an issuance to plaintiff of stock in a corporation, formed to take over a mine, which corporation had no money paid in and no assets, the mine never having been transferred to the corporation, that a note given for such stock was without consideration, and that a subscriber for stock who does not consent to a change in the subscription is released, if the corporation which is afterwards formed for a greater or less amount of capital stock than was agreed upon seeks to enforce the subscription. See, also, Collinson v. Jefferies, 21 Tex. Civ. App. 653, 54 S. W. 28; Henderson v. Ry. Co., 17 Tex. 560, 67 Am. Dec. 675; New Nueces Oil Co. v. Weil Bros. (Tex. Civ. App.) 243 S. W. 731; Cator v. Commonwealth B. & C. Co. (Tex. Com. App.) 216 S. W. 140; Byers Bros. v. Maxwell (Tex. Civ. App.) 73 S. W. 439.

For the reasons hereinabove given, I think the judgment should be affirmed as to all defendants except the appellant, Long, and that it should be reversed as to him, and here rendered in his favor.

On Motion for Rehearing and for Additional Findings.

BOYCE, J. In response to appellant's request for additional findings, we will add to the statements made in the majority opinions herein the following:

(1) As to the sale of the one-half interest in the building by the appellant bank, pending the suit on these notes: The bank executed a bond for title, dated "the ——— day of August, 1921," whereby it bound itself for the consideration of $277,000, to convey the property to ———, "on or before the ——— day of ———, 1921." The evidence shows that negotiations which resulted in the execution of this bond were conducted by one Reid, who represented the bank and Frank Kell. The testimony of all the witnesses who testified about the matter at all is that the

bank was to get $277,000 for the one-half interest in the building, as provided in the bond. There is in the record an agreement between Frank Kell, as party of the first part, and a number of other persons, as parties of the second part, also' dated "August ———, 1921," whereby the said other parties agreed with Kell—

"to form a syndicate composed of all the parties hereto for the purchase of the furniture and fixtures in that part of the building on lot No. 1, block No. 175, in Wichita Falls, Tex., occupied by the American National Bank of Wichita Falls, as well as an undivided one-half in and to the lot and building thereon situated, at and for the consideration of $400,-000."

This agreement contains these further provisions:

"Parties of the second part hereto do hereby authorize and empower party of the first part to purchase said property above described from the City National Bank of Commerce of Wichita Falls, Tex., on such terms as may seem best to the said party of the first part, as well as to purchase from the American National Bank of Wichita Falls its stock in the American Investment Company, a corporation, on such terms and conditions as to the party of the first part seem best."

The agreement then provides that each party is to pay the amount thereby subscribed, and that such amount—

"shall constitute the subscription of the parties so signing and shall be his pro rata of the said $400,000 which shall be the purchase price of the property above described."

This agreement was not signed by the bank, and Kell testified that it was completed after he had secured the bond for title from the bank. These facts do not support appellant's insistent contention that the bank sold the property for $400,000; on the contrary, they sustain the finding that we originally made that the bank agreed to sell the property for $277,000.

[6] (2) The appellant also requests us to make a finding as to what the evidence shows as, to whether the notes sued on were ac-quired by the bank before maturity. This case was tried on the following written agreement, signed by the attorneys for the respective parties, and introduced in evidence:

"It is agreed between the City National Bank of Commerce, plaintiff, and Jos. Long, Jr., defendant, that the City National Bank of Commerce became the holder of the two promissory notes herein sued upon and described in plaintiff's petition before either of said notes were overdue and without notice that either of said notes had been previously dishonored; that the plaintiff acquired said notes in good faith, and the same were transferred as collateral security for four notes previously executed to the National Bank of Commerce, of which the plaintiff

is the successor, dated May 1, 1920, signed by F. L. McCoy, Rhea S. Nixon, and Wm. N. Bonner, three being in the sum of $100,000 each, and one in the sum of $51,119.08, and an extension of time and forebearance from suit was given the original makers of the notes last above described as consideration for the transfer of the notes here in question as collateral security; that, at the time the notes herein sued upon were negotiated to the plaintiff, it had no notice of any infirmity in the instruments or defects of title of the persons negotiating the same, unless the instruments themselves gave notice of such infirmity."

This agreement was not attacked in any way in the lower court, and was not called in question in this court until the filing of the motion for rehearing. Appellant now quotes some extracts from testimony of the witness Langford, which he contends show that the notes were not acquired until after their maturity, and asks us to make a finding thereon. We doubt whether the evidence referred to necessarily has the meaning that appellant attaches to it. However that may be, we think it is now too late to call in question the agreement on which the case was tried, and we decline to go through the record for the purpose of making a finding as to whether it appears from the other evidence that the agreement does not state the truth.

Subject to the foregoing statement, the motion for additional findings is overruled. We also overrule the motion for rehearing.